**Richard O. POST, Jr., Plaintiff,**

v.

**John M. REGAN, Jr. and Marsh & McLennan Companies, Inc., Defendants.**

**No. 84 CV 9185 (RJD).**

United States District Court, S.D. New York.

Jan. 15, 1988.

Walker & Corsa, New York City, for plaintiff.

Wilkie, Farr & Gallagher, New York City, for defendants.

## MEMORANDUM OF DECISION AND ORDER

DARONCO, District Judge.

Plaintiff, Richard O. Post, Jr., brings this action against his former employer, Marsh & McLennan Companies, Inc. ("MMC" or the "Company"), an insurance brokerage and consulting business, and its Chairman of the Board of Directors and Chief Executive Officer, John M. Regan, Jr., alleging wrongful termination of his employment and three claims of defamation. Plaintiff's claims for relief arise from the circumstances attendant to MMC's announcement that plaintiff's employment with MMC was terminated coextensively with the subsequent termination of key employees and its public acknowledgement of $165 million in losses due to unauthorized bond trading. Defendants move for summary judgment, Fed.R.Civ.P. 56(c), on each of the four counts in the Amended Complaint. The material facts relevant to disposition of this Motion are not in dispute.

## BACKGROUND

Plaintiff Post joined MMC's predecessor, Marlennan Corporation, in 1973 as an Assistant Treasurer. Over the next ten years, he served in various capacities and, in early 1983, was named head of the Investment Management Group ("IMG"). In this position he managed all fiduciary and corporate cash of MMC and its operating companies and was responsible for ensuring that investments were made in compliance with relevant state laws and MMC's investment resolution. The investment resolution mandated that investments could not exceed a two-year term without the approval of MMC's Treasurer or Chief Financial Officer and denied Post or any of his subordinates authorization to borrow money to finance bonds. As the head of the IMG, Post reported to Chester A. Gan, the Company's Treasurer, and he supervised Dorothy M. Conway, the chief bond trader, and other members of the IMG.

On or about March 9, 1984, James W.S. Macdonald, Vice President–Finance, and plaintiff agreed that plaintiff's employment with MMC would be terminated. It was further agreed that plaintiff would be given a "reasonable time," specified as until "about the end of June," 1984, in which to seek new employment. Foster Aff., Exh. 11. In the interim, plaintiff was expected

to work conscientiously for MMC and, in exchange, would receive his salary and out-placement assistance, and retain his office and secretary.

Plaintiff asserts, and defendants deny, that on or about March 30, 1984, plaintiff and Edward O. Cole, Vice President–Human Resources, agreed that because of problems incurred in Post's job search, his termination date "would be put off indefinitely as necessary until (plaintiff) was able to find new employment." Plaintiff's Rule 3(g) Statement, ¶ 4. Further, plaintiff was to conduct a diligent search for new employment so as to minimize his time on the MMC payroll after June 30, 1984.

Subsequently, on or about April 5, 1984, Richard Wright, an officer of the brokerage firm of Drexel Burnham Lambert Inc. ("Drexel"), advised plaintiff that Conway had taken financed positions in government bonds which were unauthorized by MMC and invested in bonds with maturity dates beyond those authorized by MMC. Further, Wright observed that MMC was required, but failed, to disclose approximately $350 million in financings at Drexel in its public financial statements. The following day, Post advised his superior, Gan, of MMC's financed position at Drexel. When confronted, Conway verified she had large financed positions at Drexel as well as at other brokerage houses. Defendant Regan was apprised of the situation and an investigation was undertaken by MMC's inside counsel and the accounting staffs of MMC and its subsidiaries, as well as MMC's outside counsel, Wilkie, Farr & Gallagher, and independent auditors.

As the investigation progressed over the next two months, the estimate of the size of the hidden financings and the amount of the concealed losses associated with them increased. As additional information was uncovered, MMC issued press releases, submitted the requisite filings to the Securities and Exchange Commission, and postponed its Annual Meeting of Shareholders so that a complete presentation concerning the losses and the circumstances surrounding them could be made to the shareholders, the investing public and the insurance industry. Eventually, the loss to MMC was determined to be $165 million.

Soon after the initial disclosure of the unauthorized trading, plaintiff alleges, and defendants deny, that Cole, Vice President–Human Resources, instructed plaintiff to stop his search for other employment and to discontinue his outplacement activities while the unauthorized bond trading was being reported in the newspapers. Plaintiff asserts that, to his detriment, he complied with Cole's directives.

On June 8, 1984, Cole summarily notified plaintiff Post that his employment was terminated, effective immediately, and that the support services previously provided were withdrawn. His compensation, however, continued until June 30, 1984.

Later, on June 8, 1984, defendant Regan presided over MMC's adjourned Annual Meeting of Shareholders at which he read prepared written remarks concerning MMC's losses. Regan noted that, unknown to senior management, certain individuals in the IMG had engaged in unauthorized trading and financing activities and concealed it by entering incorrect investment data into the record-keeping system. Regan stated that the persons doing the unauthorized investing could have been more closely supervised, and consequently, MMC senior management believed it was appropriate to terminate the employment of certain members of IMG and the Company's Treasurer, and had done so. Defendant Regan, however, at this time, did not mention the names of any terminated employees.

After delivering his prepared remarks and responding to shareholders' questions, Regan was informally questioned by reporters. During this brief exchange with reporters, and later by telephone, Regan was asked if Conway, Post and Gan were among those whose employment had been terminated, and he responded affirmatively. Subsequently, news of MMC's Annual Meeting and its disclosures of $165 million in losses were reported by media throughout the United States, as well as in the

London Financial Times.[1] The press coverage, with respect to Post, was limited to the mention of his name as one of those whose employment had been terminated and a statement of the position he had held at MMC.

## DISCUSSION

 *Employment Termination.* Employment at-will is for an indefinite period of time and, absent a clear and definite limitation on the employer's right to discharge, the employee may be terminated at any time, without notice, and for any or no cause. *Wright v. Cayan,* 817 F.2d 999 (2d Cir.1987); *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E. 2d 919 (1987); *Murphy v. American Home Products, Inc.,* 58 N.Y.2d 293, 461 N.Y.S. 2d 232, 448 N.E.2d 86 (1983). An employer's unfettered right to discharge an at-will employee is not to be impaired by an implied covenant of good faith. *Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109, 112 (2d Cir.1985).

Relying on *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982), (at-will status may be overcome by evidence of an agreement of employment for a fixed duration or a duration capable of determination), plaintiff maintains that, pursuant to the alleged promise of Cole, there was a contractual obligation to allow Post to remain on MMC's payroll, with support services, until he found new employment. Plaintiff argues that "such time as it took him to find new employment" is a duration capable of determination and, therefore, under *Weiner,* there was an express limitation on MMC's right to discharge him. Plaintiff also contends that by wrongfully discharging plaintiff before he found new employment, defendants breached the implied covenant of good faith which attaches to such contractual relations.

The defendants deny plaintiff was promised continued employment with MMC beyond June 30, 1984, or that he was instructed to cease his efforts to obtain new employment at the time the unauthorized bond trading losses were being investigated and reported. Defendants argue that even if Post's allegation that MMC agreed to extend his employment indefinitely until he was able to secure new employment was true, such condition is insufficient to impose an express limitation on MMC's right of discharge.

 The Court finds that even assuming *arguendo* an agreement to extend Post's employment, compensation, support services, and outplacement activities until he obtained new employment, such an agreement would be insufficient to negate plaintiff's at-will status. *See Wright,* 817 F.2d 999 (a letter from an employer according an employee a permanent appointment did not create an employment contract of specific duration), *Hunnewell v. Manufacturers Hanover Trust Co.,* 628 F.Supp. 759 (S.D.N.Y.1986) (employer's statement that employee would be hired through normal retirement age did not sufficiently state a definite term of employment), *Collins v. Hoselton Datsun, Inc.,* 120 A.D.2d 952, 503 N.Y.S.2d 203 (4th Dept.1986) (employee handbook that provided for "job security" did not bar termination of an at-will employee except for cause, when subject of termination not addressed nor susceptible of being interpreted as requiring just cause). The Court notes, also, that implied contractual obligations may coexist with express provisions which appear to negate them where the relationship of the parties, as structured by the contract, so dictates. *Wakefield,* 769 F.2d 109, 112. It strains common sense to suggest an employer would agree to limit his right to discharge for cause an employee already terminated, but allowed to remain on the payroll while seeking alternative employment.

Plaintiff fails to adduce any evidence that MMC expressly agreed to limit its

---

**1.** The statements made by defendant Regan were republished in, among others, the following media: The New York Times, The Journal of Commerce, The Wall Street Journal, The New York Post, The Washington Post, Business Insurance and The London Financial Times. The leading wire services Associated Press and United Press International, also disseminated the statements to newspaper, radio and television subscribers throughout the United States.

right to terminate Post and, therefore, he remained an at-will employee whose employment was of indefinite duration. Accordingly, defendants' Motion for summary judgment as to the wrongful termination of employment and breach of implied covenant of good faith claims is granted.

*Defamation Claims.* Plaintiff's three defamation claims differ only in the standard for liability and the type of damages sought: (1) liability without fault, or libel *per se*; (2) liability based on actual knowledge of falsehood or, alternatively, simple negligence; and, (3) liability based on gross irresponsibility "and reckless disregard for the truth" as required for the recovery of punitive damages.

Initially, the Court must determine whether the words complained of are susceptible of the defamatory meaning attributed to them by the plaintiff, and if they are not, innuendo, cannot make them libelous. *Bordoni v. New York Times Company, Inc.,* 400 F.Supp. 1223, 1230 (S.D.N.Y. 1975). Statements are susceptible to defamatory interpretation if they would tend to expose the subject to contempt, aversion or disgrace or induce an evil opinion of him in the minds of reasonable persons, and are false. *See Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). The words are to be viewed in context and given their ordinary and usual meaning, *Bordoni,* 400 F.Supp. at 1227, as they would be read and understood by the public to which they are addressed. *November v. Time, Inc.,* 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963). They are to be read as a whole and with respect to the circumstances of publication. *James v. Gannett Co.,* 40 N.Y.2d 415, 386 N.Y.S. 2d 871, 353 N.E.2d 834 (1976).

Plaintiff alleges that defendant Regan defamed him because neither in his remarks at the Annual Meeting of Shareholders nor in later interviews with reporters, did Regan indicate that the agreement to terminate Post's employment had been made prior to the discovery of the unauthorized trading losses; that he was not discharged by reason of involvement in, or knowledge of, the unauthorized bond trading problem; and that, in fact, Post was the person responsible for disclosing the unauthorized trading activities to senior management. Rather, plaintiff contends that taken as a whole and in context, and given their natural and ordinary meaning, Regan's remarks at the shareholders' meeting and his answer to reporters' questions, were reasonably understood to

"accuse plaintiff of being one of the employees who had been dismissed as a result of his role in the unauthorized bond trading and financing which had cost defendant Marsh & McLennan Companies, Inc. a pre-tax loss of approximately $160 million; to declare that plaintiff had participated in the deliberate, fraudulent concealment of such trading by making falsified entries in the record keeping system of the defendant Marsh & McLennan Companies, Inc. such as disguising payments of margin calls as new purchases, and representing next coupon dates as maturity dates; to assert that plaintiff had sought to cover up his participation in unauthorized bond trading and financing and the losses engendered thereby by continuing and expanding such trading; to represent that investigation had shown plaintiff to be equally culpable with Treasurer Chester A. Gan and Assistant Treasurer Dorothy M. Conway for such losses; and to state plaintiff had been 'fired' for those reasons ... [and to] create the impression that defendants believed plaintiff may have engaged in criminal conduct."

Amended Complaint at 16. Further, plaintiff alleges his status at MMC was a private matter between private parties, not one of public concern, thereby making the defendants strictly liable for the defaming remarks. Due to the alleged defamatory remarks, Post contends he has been unable to obtain employment with any major financial institutions.

Defendants dispute defamation by innuendo and argue that, as evidenced by the $165 million losses due to unauthorized investment activity, Regan's statements were true in that Post certainly did not

fulfill his duties and responsibilities as head of the IMG. Defendants contend that a major public corporation's disclosure of a loss of $165 million due to unauthorized trading is a matter of concern to MMC's shareholders, employees, and insurance brokerage clients, whose funds have been entrusted to MMC, as well as to potential investors, and as evidenced by the media interest in the losses and the remedial actions taken by MMC, is a matter of public concern. Therefore, in order to succeed on a defamation claim, the defendants assert plaintiff must demonstrate gross irresponsibility in addition to proving the falsity of defendant Regan's statements.

■ *Standard for Liability.* Plaintiff argues this is a defamation action by a private citizen against a corporation in the private sector, whose Chairman falsely accused plaintiff of professional incompetence and fraud. It is plaintiff's position that proof of fault and actual damages are not legal prerequisites to recovery under long established New York libel *per se* decisions, citing *Mencher v. Chesley,* 297 N.Y. 94, 75 N.E.2d 257 (1947); *Kleeberg v. Sipser,* 265 N.Y. 87, 191 N.E. 845 (1934); *Nichols v. Item Publishers,* 309 N.Y. 596, 132 N.E.2d 860 (1956); *Macy v. New York World–Tel Corp.,* 2 N.Y.2d 416, 161 N.Y.S. 2d 55, 141 N.E.2d 566 (1957). Defendants, on the other hand, argue that strict liability for defamation is no longer the law of New York, and, to succeed, plaintiff must prove the defendants were grossly irresponsible and the statements were false. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (states may define for themselves an appropriate standard of liability for a publisher or broadcaster of defamatory statements about a private individual, but there cannot be liability without fault); *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975) (when content is of public concern, standard for liability is gross irresponsibility without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties); *Pollnow v. Poughkeepsie Newspapers, Inc.,* 107 A.D.2d 10, 486 N.Y.S.2d

11 (2d Dept.1985), *aff'd,* 67 N.Y.2d 778, 501 N.Y.S.2d 17, 492 N.E.2d 125 (1986) (a nonmedia individual defendant who utilizes a public medium for the publication of matter deemed defamatory should be accorded the same constitutional privilege as the medium itself).

The Supreme Court in *Dun & Bradstreet v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed 2d 593 (1985), held that fault must be proved where the subject matter of the speech by a non-media defendant is of sufficient public concern to warrant heightened constitutional protection. Both the plaintiff and the defendants acknowledge the widespread publicity given by the media to the reported losses and subsequent personnel actions. *See Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 477 N.Y.S.2d 82, 465 N.E.2d 802 (1984) (a determination of what constitutes matters of public concern is an editorial function, and is strong evidence that it is of legitimate public interest). As evidence that the statements were of public concern, defendants submit the testimony of news reporters from Business Insurance, The Journal of Commerce, and the Wall Street Journal, who stated they "covered" the Annual Meeting of Shareholders because the bond losses were of public concern, and that the names and positions of personnel terminated in the wake of the disclosures were also of public concern. McLeod dep. at 20–23; Milligan dep. at 14; Smith dep. at 32–33, 42. In response, plaintiff offers no evidence the statements were not of public concern. Rather, he merely avers that the sheer magnitude of the loss cannot transform it into a matter of public concern. But the testimony of the reporters and the newspapers clippings included in the moving papers are evidence that the size of the loss made the events at MMC of public concern.

Upon all the evidence submitted, the Court finds that a loss to a public corporation of $165 million due to unauthorized trading activities and the subsequent remedial actions taken by the corporation widely reported by the media, are of public concern. *See Luisi v. JWT Group, Inc.,* N.Y.

L.J., Sept. 18, 1987, at 7, col. 3 (N.Y.Sup. Ct.). Therefore, the standard for liability is gross irresponsibility without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. *Chapadeau*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569; *Pollnow*, 107 A.D.2d 10, 486 N.Y.S.2d 11, *aff'd*, 67 N.Y.2d 778, 501 N.Y.S.2d 17, 492 N.E.2d 125. Accordingly, defendants' Motion for summary judgment as to the second and third causes of action is granted.

 The court need not decide whether Regan's remarks are susceptible to a defamatory interpretation, because defendants' Motion can be decided on other grounds. Even if the statements are found to be defamatory, in order to succeed, the plaintiff must show that the defendants conducted and reported the results of their investigation in a grossly irresponsible manner. *See Luisi*, N.Y.L.J., Sept. 18, 1987. Defendants have come forward with admissible evidence that the investigation and subsequent reporting were conducted in a careful, responsible manner. The investigation was conducted over a two-month period, and was not done hastily. It involved interviews of relevant parties and reviews of transactions and documents by inside and outside counsel, by staff and independent accountants, as well as by senior management. The prepared remarks were reviewed by those same parties. In opposition, plaintiff submitted Regan's testimony that the termination on June 8, 1984 was a confirmation of the decision made in early March to terminate Post. This, however, is not inconsistent as MMC did not relinquish its right to terminate plaintiff for cause prior to June 30, 1984. The fact that Post was not a party to the concealed, unauthorized trading is irrelevant as he was charged with the responsibility of enforcing MMC's investment resolutions and complying with relevant state laws. Regan merely stated that as a result of the investigation, senior management agreed that it was appropriate to take certain actions regarding personnel, and that Post was one of the key personnel terminated. To conclude by innuendo from this that Post was an active participant in the unauthorized activity "stretch(es) an innuendo beyond its outer limits," and is unwarranted. *Bordoni*, 400 F.Supp. at 1230. It seems appropriate to conclude the employment period of an employee, especially one already terminated, who is charged with responsibility for the conduct of his subordinates, where the conduct was outside the scope of company policy and led to losses of $165 million.

The Court finds that, based on the entire record, neither Regan nor MMC acted in a grossly irresponsible manner, and plaintiff has not, by a preponderance of the evidence, shown that they did. As plaintiff cannot demonstrate gross irresponsibility, it follows he cannot meet the higher standard of actual malice. Accordingly, defendants' Motion for summary judgment as to the fourth claim is granted.

Based on the foregoing, the defendants' Motion for summary judgment is granted in its entirety and the Complaint is dismissed.

SO ORDERED.