Lyndi W. MOTT, Plaintiff,

v.

**ANHEUSER–BUSCH, INCORPORATED
and Walter A. Suhre, Jr.,
Defendants.**

No. 90–CV–1047.

United States District Court,
N.D. New York.

Dec. 29, 1995.

D'Arrigo Law Offices, Liverpool, New York, for Plaintiff; Mario D'Arrigo, of counsel.

Gibson, Dunn & Crutcher, New York City; for Defendants; Robert D. Sack, Mary P. Donlevy, of counsel.

Hancock & Estabrook, Syracuse, New York, for Defendants; Walter L. Meagher, Jr., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

This is a suit for defamation and wrongful termination arising out of plaintiff's former employment as the supervisor of a wastewater treatment laboratory located at Anheuser–Busch's brewery in Baldwinsville, New York ("treatment plant" or "plant"). Plaintiff's claims for relief stem from the circumstances attendant to Anheuser–Busch's public announcements that three of its employees (one of whom, though remaining unnamed in the announcements, was plaintiff) had engaged in illegal conduct at the treatment plant, that the employees' activity had been undertaken without the knowledge of other corporate officials, and that the employees had been terminated following an internal investigation. Presently before the court is defendants' motion for summary judgment on all counts. Defendants argue first that plaintiff's wrongful termination claims should be dismissed because plaintiff was terminable at-will, and second that plaintiff's defamation claims should be dismissed because plaintiff cannot establish that defendants' actions in conducting and reporting the results of its internal investigation were grossly irresponsible. The court heard oral argument in Syracuse, New York on May 12, 1995.

## BACKGROUND

On February 6, 1989, the Syracuse Post–Standard reported claims by a former Anheuser–Busch employee that other employees at the Baldwinsville treatment plant were falsifying reports to the New York State Department of Environmental Conservation ("DEC"). *See* Exhibit ("Exh.") C, attached to Meagher Affidavit, Document ("Doc.") 31. In response to this allegation Anheuser–Busch, through its General Counsel Walter Suhre, initiated an internal investigation. The investigation revealed that plant supervisory employees had engaged in an ongoing program of taking and reporting misrepresentative samples of the plant's effluent, resulting in false reports to the DEC that the treatment plant was in compliance with its State wastewater permit.

The investigation specifically found that personnel were guilty of: (i) pre-testing plant effluent for phosphorous to see if results of a sample taken at that time would meet State standards, while refraining from sampling when they knew the samples would show impermissibly high phosphorus levels; (ii) treating the wastewater with alum, a phosphorus-reducing chemical, immediately before and in conjunction with taking samples for purposes of reporting phosphorus content to the State, thereby artificially reducing the phosphorus values reported; (iii) taking required samples immediately after "alum-dosing" on consecutive Saturdays and Sundays, using the Saturday result as the sample for the preceding week and the Sunday result as the sample for the following week, thereby giving a deliberately false view of the general phosphorus levels of the effluent; and (iv) using hoses to bypass part of the wastewater treatment system.

The Anheuser–Busch investigation concluded that four treatment-plant officials knew about, were responsible for, or participated in these activities: the Manager of Environmental Operations, Richard Moore; his subordinate, the manager of the wastewater treatment plant, Robert Cordell; a laboratory supervisor, plaintiff Lyndi Mott; and her predecessor, Ann Marie Meehan. As a result, Moore and Cordell were terminated, plaintiff resigned, and Meehan was reprimanded.

The results of the investigation were summarized in a 56–page report submitted by Anheuser–Busch to the DEC in April, 1989. In connection with these events, the State brought civil charges against Anheuser–Busch for violations of its State Pollutant

Discharge Elimination System ("SPDES") permits. In September, 1989, Anheuser–Busch settled these charges by signing, together with the DEC and the New York Attorney General, an order on consent that included paying a $925,000 penalty to the State. *See* Order on Consent, Exh. G, attached to Meagher Affidavit, Doc. 31. Later, on September 13, 1989, Anheuser–Busch pleaded guilty to three misdemeanor counts for violation of the SPDES permits, and consented to an additional fine of $75,000. *See* Transcript of Sentencing, Exh. H, attached to Meagher Affidavit, Doc. 31. As part of the plea agreement Anheuser–Busch and all its officers and employees *other than* Moore, Cordell, and plaintiff were released from further civil or criminal exposure. *Id.* The State's criminal investigation for environmental and related violations remained open as to Moore, Cordell, and plaintiff. *Id.*

On September 14, 1989, Anheuser–Busch officials held a press conference at which defendant Suhre issued a news release. Suhre read aloud, in pertinent part, as follows:

> Anheuser–Busch, Inc. has agreed to pay $75,000 in fines and $925,000 in civil penalties to settle issues with the State of New York relating to the operations of the company's Baldwinsville brewery wastewater treatment facility.

> These issues center around actions by three employees at the treatment plant, undertaken without the knowledge of their supervisors and contrary to company policies. The company immediately began an internal investigation after learning of possible problems through a newspaper account, which was based on allegations made by a former employee at the wastewater treatment plant.

> . . . .

> The company has taken steps to correct the problems and ensure that they will not occur again. Two of the employees were dismissed and the third resigned. Anheuser–Busch voluntarily supplied the New York Department of Environmental Conservation with a full report of the company's investigation.

> Although the company did not have prior knowledge of the actions of these three individuals, it is legally responsible for the on-the-job activities of its employees. Therefore, Anheuser–Busch agreed to the present settlement.

News Release, Exh. J attached to Meagher Affidavit, Doc. 31. The news release was initially drafted by Anheuser Busch's public relations firm. It was revised and redrafted several times by various employees of Anheuser–Busch, including Suhre.

In response to questions at the press conference, Suhre is alleged to have stated that:

> Nobody in St. Louis knew that that plant was not being operated the way it was supposed to;

> Our investigation left no stone unturned and nobody above Moore could have known what was going on;

> We are convinced without question that knowledge of what went on, and participation of what went on was limited to senior management at the wastewater treatment plant.

These statements were allegedly published in various media. *See* Amended Complaint, Doc. 7, at 10–11.

On September 17, 1989, the Syracuse Herald–American published an editorial entitled "Pollution Problems; Brewery Tries to Shift Blame," which accused Anheuser–Busch of engaging in a deliberate cover-up at the treatment plant by "shift[ing] the blame onto its former workers to distance its good name from the whole affair." *See* Defendants' ("Def.") Memorandum ("Mem.") of Law in Support of Their Motion for Summary Judgment, Doc. 30, at 21. In response to this editorial, defendant Suhre, on behalf of Anheuser–Busch, submitted to the Herald–American a letter to the editor that had been initially drafted by Anheuser–Busch's public relations firm. The letter, published on September 24, 1989, contained statements that Senior Anheuser–Busch management had no prior knowledge of wrongdoing at the Baldwinsville plant and that the violations had been committed by three plant employees who were terminated following the internal investigation. Letter to the Editor, Exhs.

262 and 338, attached to Mott Affidavit, Doc. 41. Again, plaintiff was not named in any of the statements.

On October 15, 1989, the Herald–American published an article relating to the settlement between Anheuser–Busch and the DEC. The newspaper stated that senior executives of Anheuser–Busch knew of the illegal dumping into the Seneca River. The article quoted defendant Suhre as stating that "[n]obody in St. Louis knew that that plant was not being operated the way it was supposed to." The article contrasted Suhre's comment with the prosecutor's contention that "the knowledge of the hose connection was at the highest levels both at the brewery and in St. Louis." Article, Exh. K, attached to Meagher Affidavit, Doc. 31.

On October 16, 1989, the St. Louis Post–Dispatch reported the claims contained in the Herald–American article of the previous day. The Post–Dispatch article quoted defendant Suhre as stating in response to the accusations that "we're denying senior officials knew that that system in New York was being operated other than in accordance with a permit or law." Suhre was further quoted as stating that "[w]e were duped by a scheme that was fraudulent and clandestine." *See* Amended Complaint, Doc. 7, at 16–17. The article reported that although Suhre admitted that one or more environmental engineers in St. Louis "may have known" about the hoses, he claimed that "they clearly did not know the effect of the use of the hoses." Def.'s Mem. of Law, Doc. 30, at 23. Moreover, he stated that "senior management did not know." According to Suhre, "no one in St. Louis knew" about two other related violations at the plant. *See* Amended Complaint, Doc. 7, at 16–17.

## DISCUSSION

### A. Summary Judgment Standards

The principles this court must apply in analyzing the current motion for summary judgment are well established. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall enter if, when viewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992); *United States of America v. Rem*, 38 F.3d 634, 643–44 (2d Cir.1994). When the moving party does not bear the ultimate burden of proof on an issue, that party satisfies its summary judgment burden by "point[ing] to the absence of evidence to support an essential element of the non-moving party's claim." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1986). Where the movant shoulders the burden of proof, it must establish that there is no genuine issue of material fact to be decided regarding any element of that party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In either case, if the movant satisfies its initial summary judgment burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists. *Weg v. Macchiarola*, 995 F.2d 15, 18 (2d Cir.1993). In other words, the opposing party must show that there exists a "genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial." *Rem*, 38 F.3d at 643–44 (citations omitted). "Only disputes over facts that might affect the outcome of the suit under governing law" are considered material so as to preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). To avoid the entry of summary judgment, Rule 56(e) requires the opposing party to come forward with specific facts that demonstrate the existence of issues which must be decided by a fact-finder "because they may reasonably be decided in favor of either party." *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990).

The district court's function on a summary judgment motion is not to weigh the evidence or to resolve disputed issues of fact; rather, the court must determine whether there is a genuine factual issue for trial. *Eye Associates, P.C. v. IncomRx Systems Ltd. Partnership*, 912 F.2d 23, 26 (2d Cir.1990). In so doing, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991). This does not mean that the court will make assumptions to benefit the nonmoving party. Only where the facts specifically set forth by the nonmoving party in accordance with Rule 56(e) contradict facts specifically averred by the movant, will the court determine that a genuine issue exists to preclude the entry of summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990); *see also Nat'l Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989) ("if the party opposing summary judgment generates uncertainty as to the true state of any material fact ... summary judgment is inappropriate").

With these rules in mind, the court turns to the specific arguments raised on defendants' motion for summary judgment.

## B. Plaintiff's Causes of Action

### 1. Wrongful Termination

#### a. Choice of Law

■ This court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332. Although the parties do not raise the issue, as a threshold matter the court must determine which law to apply. A federal court sitting in diversity must look to the forum's choice of law rules to determine which state's substantive law to apply. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Chrysler Capital Realty, Inc. v. Grella*, 942 F.2d 160, 162 (2d Cir.1991) (citations omitted). Under New York choice of law rules, this court must apply New York substantive tort law because it is the state with the most significant relationship to the events giving rise to this litigation. *Babcock v. Jackson*, 12

N.Y.2d 473, 484–85, 240 N.Y.S.2d 743, 752, 191 N.E.2d 279, 285 (1963); *Chrysler Capital*, 942 F.2d at 162 (citing *Machleder v. Diaz*, 801 F.2d 46, 51 (2d Cir.1986), *cert. denied sub nom. Machleder v. CBS, Inc.*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987)).

New York has a strong interest in this litigation. Plaintiff, a resident of New York, was employed by defendant Anheuser–Busch, Inc. in New York. Indeed, most of the activities in the case at bar occurred in this forum. The court concludes that New York has the most significant relationship to the events giving rise to this litigation. Therefore, New York substantive tort law governs the disposition of plaintiff's wrongful termination claim.

#### b. Plaintiff Was Not Wrongfully Terminated

Plaintiff alleges in her cause of action for wrongful termination that there was an implied agreement between plaintiff and Anheuser–Busch that as long as plaintiff continued to perform her duties competently, she would not be terminated in her employment except for cause. The amended complaint alleges, inconsistently, both that plaintiff was fired and that plaintiff resigned. Amended Complaint, Doc. 7, at 21–22. However, plaintiff's counsel conceded at oral argument that plaintiff resigned, rather than being fired. Accordingly, the court concludes that plaintiff's wrongful discharge claim rests on the assertion that she resigned from Anheuser–Busch under threat of imminent dismissal.

Turning to the merits of plaintiff's claim, the court notes that New York has never wavered from the traditional rule that, "absent an express agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920 (Ct.App.1987). An employee-at-will may be terminated "for any reason or even for no reason." *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86, 89 (Ct.App.1989); *Post v. Regan*, 677 F.Supp. 203 (S.D.N.Y.), *aff'd mem.*, 854 F.2d 1315 (2d Cir.1988), *cert. denied*, 488 U.S.

1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989) ("Employment at-will is for an indefinite period of time and, absent a clear and definite limitation on the employer's right to discharge, the employee may be terminated at any time, without notice, and for any or no cause.") (citations omitted). Nonetheless, the presumption that employment is at-will can be rebutted by establishing that "the plaintiff was made aware of a written policy of limitation on the employer's right to discharge at the time the employment commenced and, in accepting the employment, the plaintiff relied on the 'termination only for cause' limitation." *Brooks v. Key Pharmaceuticals, Inc.*, 183 A.D.2d 1011, 583 N.Y.S.2d 673, 674 (3rd Dep't 1992) (quotation and citations omitted). This "express limitation" exception to the traditional common law rule was developed by the New York Court of Appeals in *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982).

In the case at bar, plaintiff argues that her cause of action for wrongful discharge is controlled by *Weiner*. In that case, no fixed term of employment existed, but the employer-defendant had assured the plaintiff during his job interview that the firm's policy was to discharge only for cause. In addition, the plaintiff signed an employment application which specifically referred to this policy. Finally, the employer-defendant's personnel policy and procedure manual stated that employees would be dismissed "for just and sufficient cause only."

The *Weiner* court found that the employer's promise to terminate only for just cause was supported by adequate consideration, and therefore was enforceable. *Weiner*, 57 N.Y.2d at 465, 457 N.Y.S.2d at 197, 443 N.E.2d at 445. Four factors were dispositive to that determination: 1) plaintiff had been induced to leave his former employer by assurances that defendant's employees would not be discharged without cause; 2) the assurance was incorporated into the employment contract; 3) the plaintiff relied on the assurance to his detriment by rejecting other offers of employment; and 4) while employed by the defendant, plaintiff had been told that he could only fire his subordinates by strictly complying with the personnel manual. *Id.*

In the case at bar, plaintiff alleges that Anheuser–Busch entered into an express limitation on its right to terminate plaintiff when it informed her by letter that "in the event the investigation exonerates the actions of [plaintiff]," Anheuser–Busch would "try" to find a position for plaintiff in the company. Letter, Exh. A, attached to Plaintiff's Statement of Facts in Dispute, Doc. 37. For several reasons, plaintiff has failed to demonstrate that Anheuser–Busch's statement falls within *Weiner*'s narrow holding.

First, as counsel conceded at oral argument, plaintiff was not terminated. She resigned. Plaintiff points to no authority that allows her to recover for wrongful termination in such circumstances.

Second, the court concludes that the statement does not create an express limitation on Anheuser–Busch's right to terminate plaintiff. Instead, the statement is at best a promise to rehire or reinstate plaintiff on the condition that Anheuser–Busch's internal investigation exonerated her. Far from limiting Anheuser–Busch's right to dismiss plaintiff at will, the statement makes clear that plaintiff had already been suspended, thereby reinforcing rather than diminishing Anheuser–Busch's rights. Plaintiff has not shown that any assurance that she would not be discharged without cause was incorporated into her employment contract.

Third, plaintiff has failed to plead and demonstrate that she relied to her detriment on Anheuser–Busch's statement, and thus does not satisfy the third prong of the *Weiner* analysis.

Finally, plaintiff has not demonstrated that Anheuser–Busch failed to honor any limitation placed upon its right to terminate plaintiff. Anheuser–Busch's promise to rehire plaintiff was conditioned upon her being exonerated by Anheuser–Busch's investigation. Clearly, plaintiff was not exonerated by the investigation. Because the condition was not met, the conditional promise can not be enforced. Thus, plaintiff has no standing to sue for wrongful termination under *Weiner*.

Therefore, the court concludes that plaintiff's cause of action for wrongful termination can not be sustained as a matter of law. Accordingly, defendants' motion for summary judgment is granted in so far as it addresses plaintiff's wrongful termination claim.

### 2. *Defamation*

#### a. *Standard of Liability; private figure and matter of public concern*

Plaintiff's defamation claims are subject to analysis under both the federal and state constitutions. Seeking to strike a balance between the competing constitutional concerns, the Supreme Court held that, as long as they do not impose strict liability, the States may define for themselves the standard of liability for a publisher or broadcaster being sued in defamation by a private plaintiff. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). In accordance with this constitutional framework, the New York Court of Appeals has stated that "the protection accorded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required" under the United States Constitution. *Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 914, 567 N.E.2d 1270, 1278 (1991) (internal citation omitted) *cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). On both the federal and the New York State analyses, the applicable standard of proof varies, depending on whether plaintiff is a public or private figure and whether or not the subject of the challenged speech is a matter of public concern. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 13–16, 110 S.Ct. 2695, 2702–2704, 111 L.Ed.2d 1 (1990) (federal law); *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 64 (2d Cir.1993) (New York law).

In the case at bar, the parties do not dispute that plaintiff is a private figure. Therefore, the court turns to the question of whether the subject of the statements involved a matter of public concern.

What constitutes a matter of public concern is a question of law for the court. *See*

*Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 349, 477 N.Y.S.2d 82, 85, 465 N.E.2d 802 (1984) (determination of what is within the sphere of public concern rests primarily with media, and "will not be second-guessed so long as they are sustainable"). The Supreme Court has held that "[w]hether ... speech addresses a matter of public concern must be determined by [the expression's] content, form, and context ... as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985) (quotations and citation omitted). The New York Court of Appeals has held that a statement is "within the sphere of legitimate public concern" when it is "reasonably related to matters warranting public exposition." *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569, 571 (1975). A matter of "public concern" has been defined as follows: "A public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.... A general concern or interest will not suffice." *Fairley v. Peekskill Star Corp.,* 83 A.D.2d 294, 298, 445 N.Y.S.2d 156, 159 (2d Dep't 1981).

■ The statements in the case at bar related to illegal activities by a nationally recognized corporation. Anheuser–Busch's admitted violations of environmental regulations implicate issues of environmental safety and public health. Further, the matter received media attention in at least two states. *See Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 349, 477 N.Y.S.2d 82, 85, 465 N.E.2d 802, 805 (1984) (determination of what constitutes a matter of public concern is an editorial function; publication is strong evidence that it is of legitimate public interest); *accord, Post v. Regan,* 677 F.Supp. 203, 208 (S.D.N.Y.1988). Given this context, the court finds that the statements at issue are reasonably related to matters warranting public exposition, and therefore fall within the sphere of legitimate public concern.

When, as in the case at bar, the plaintiff is a private figure and the speech relates to a matter of public concern, there are five elements, apart from damages, of a defamation

cause of action: 1) a defamatory statement, 2) that referred to the plaintiff, 3) published by the defendant, 4) that was false, and 5) published in a grossly irresponsible manner (i.e., fault). *See* 2 New York Pattern Jury Instructions, § 3:23A (1996 Supp.) (citations omitted).

### b. Fault; Grossly Irresponsible

The Supreme Court has held that in a defamation action in which the plaintiff is a private figure, the speech relates to a matter of public concern, and the defendant is a media publisher, the plaintiff must prove some degree of fault. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). The fault standard adopted by the New York Court of Appeals in *Chapadeau* dictates that an allegedly defamed private individual must demonstrate by a preponderance of the evidence that the defendant "acted in a grossly irresponsible manner, without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau*, 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d at 571.

Although the New York Court of Appeals has never expressly extended *Chapadeau*, which involved a media defendant, to non-media defendants, this court is among several which have done so. In *J & J Sheet Metal Works, Inc. v. Picarazzi*, 793 F.Supp. 1104, 1112 (N.D.N.Y.1992), this court ruled that non-media defendants should be treated the same as media defendants. The court quoted then-Justice Cardamone of the Fourth Department, reasoning that " 'as a practical matter and for reason of logic, there is more consistency and simplicity where one uniform rule governs in defamatory falsehood litigation.' " *Id.*, 793 F.Supp. at 1112 (quoting *Rupert v. Sellers*, 65 A.D.2d 473, 411 N.Y.S.2d 75 (4th Dep't 1978), *aff'd on other grounds*, 50 N.Y.2d 881, 430 N.Y.S.2d 263, 408 N.E.2d 671 (1980), *cert. denied*, 449 U.S. 901, 101 S.Ct. 272, 66 L.Ed.2d 132 (1980)). This court's ruling was applied by the Southern District of New York in *Naantaanbuu v. Abernathy*, 816 F.Supp. 218, 229 (1993). State courts have agreed. *See, e.g., Park v. Capital Cities Communications, Inc.*, 181

A.D.2d 192, 585 N.Y.S.2d 902, 906 (4th Dep't) ("... private defendants are entitled to be held to the same standard as the media defendant when the publication involves a matter of public concern."), *app. dismissed*, 80 N.Y.2d 1022, 592 N.Y.S.2d 668, 607 N.E.2d 815 (1992); *McGill v. Parker*, 179 A.D.2d 98, 582 N.Y.S.2d 91, 97 (1st Dep't 1992) ("There is no reason ... to provide greater protection to the media in defamation suits than to others exercising their freedom of speech."). *Accord* Restatement (Second) of Torts §§ 566(c) and 580B(e). From this body of law, the court concludes that *Chapadeau* applies to the non-media defendants in this case.

Viewing the evidence in the light most favorable to plaintiff, *Chapadeau* requires the court to decide if plaintiff has raised a genuine issue of material fact as to whether defendants conducted and reported on the results of their investigation in a "grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau*, 38 N.Y.2d at 199, 379 N.Y.S.2d at 64, 341 N.E.2d at 571. The court concludes that plaintiff has not met this burden.

Attempting to define "gross irresponsibility," the Court of Appeals has said that it means something more than simple negligence, *Weiner v. Doubleday & Co., Inc.*, 74 N.Y.2d 586, 595, 550 N.Y.S.2d 251, 254–55, 549 N.E.2d 453, 456 (1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990), and that the test is an objective one that is not dependent upon the defendant's state of mind. *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 350–51, 477 N.Y.S.2d 82, 86, 465 N.E.2d 802, 806 (1984).

Defendants have come forward with admissible evidence that, when viewed in the light most favorable to plaintiff, demonstrates that their investigation and subsequent reporting were carried out in a thorough and responsible manner. The investigation was initiated immediately following reports of wrongdoing at the Baldwinsville plant, and was conducted over a two month period. The investigative team was comprised of both Anheuser–Busch employees

from the legal and environmental departments and outside legal counsel from three different law firms. The investigation included interviews with all relevant parties, including plaintiff, and an extensive review of the books and records of the treatment plant both in Baldwinsville and St. Louis. *See* Exh. AA, attached to Meagher Affidavit, Doc. 32. Defendants knew that the results of their investigation would be subject to review by the State, and voluntarily submitted to the State the investigation's findings in a 56–page report, together with all the collected evidence. *See* Exh. AA, attached to Meagher Affidavit, Doc. 32. The State's publicly expressed view of the matter and subsequent criminal investigations supported the investigative report's conclusion that culpable wrongdoing was limited to three employees, of which plaintiff was one. *See* Transcript of Plea Hearing, Exh. H, attached to Meagher Affidavit, Doc. 31. The consent order, in which Anheuser–Busch agreed to pay one million dollars in civil charges and criminal fines, and signed by the DEC and New York Attorney General, stated that "[f]rom the outset of its investigation, [Anheuser–Busch] acted in a responsible and cooperative manner." Order of Consent, Exh. G, attached to Meagher Affidavit, Doc. 31, at 4. Lastly, once Anheuser–Busch's investigation had determined that plaintiff may have been guilty of wrongdoing, and before the report was submitted to the State, plaintiff was invited to respond "on the record" to the findings of the investigation, explain her actions, and absolve herself of responsibility. Plaintiff declined to take advantage of this opportunity to come forth. *See* Deposition of Lyndi W. Mott, Exh. JJ, attached to Meagher Supplemental Affidavit, Doc. 44, at 525–26.

Plaintiff's allegations do not lead this court to take a view of the matter different from that of the DEC, the New York Attorney General, and State Prosecutors. As discussed below, plaintiff's supporting documents are replete with vague and inaccurate allegations of omissions and inaccuracies in Anheuser–Busch's investigation, which plaintiff argues demonstrate "gross irresponsibility" on the part of defendants. After a careful examination of the record, the court concludes that plaintiff has failed to show that there exists an issue of material fact as to defendants' alleged gross irresponsibility sufficient to withstand defendants' summary judgment motion.

Plaintiff's lengthy response papers can be reduced to a handful of allegations. For example, plaintiff alleges that Anheuser–Busch sought to "control the investigation" in order to avoid a full-scale investigation by the State. Plaintiff's Mem. of Law, Doc. 36, at 5–7. Even if true, however, this claim does not raise a question as to gross irresponsibility on the part of defendants. The mere fact that an investigation was conducted internally indicates nothing about the quality of that investigation; in fact, the State's subsequent statement that Anheuser–Busch's conduct was from the outset "responsible and cooperative" indicates precisely that the investigation was *not* grossly irresponsible.

In another representative example, plaintiff alleges that her "guilt or innocence was irrelevant" to Anheuser–Busch, whose "purpose was to sacrifice her to the regulatory agencies in exchange for leniency and protection of its liquor licenses." Plaintiff's Mem. of Law, Doc. 36, at 9. Plaintiff cites in support of this claim the fact that Meehan, plaintiff's predecessor in the laboratory, was not subjected to the same treatment by Anheuser–Busch. *Id.,* at 9. However, plaintiff brings forth no evidence that Meehan was spared termination for any reason other than her repeated vocal opposition to the practices at the treatment plant and her cooperation with the investigation. Unlike Meehan, plaintiff declined an invitation to cooperate with the investigation by being interviewed on the record. Deposition of Lyndi W. Mott, Exh. JJ, attached to Meagher Supplemental Affidavit, Doc. 44, at 525–26. Further, the State's subsequent criminal prosecutions, which included plaintiff but did not include Meehan, lend support to Anheuser–Busch's conclusion that Meehan was less culpable than plaintiff. Plaintiff's allegation in this regard is unsubstantiated by the record and fails to raise a genuine issue of material fact.

Plaintiff also alleges that the investigation was "limited in scope" in its "failure to pur-

sue" Martin and Yohman, two St. Louis-based Anheuser–Busch environmental engineers whom plaintiff alleges were aware of wrongdoing at the Baldwinsville plant. Plaintiff's Mem. of Law, Doc. 36, at 24–30. However, the record unambiguously demonstrates that Martin and Yohman were aggressively investigated. It is significant that copies of the documents that plaintiff alleges establish Martin and Yohman's involvement were repeatedly discussed in the Investigation Report and attached to it for the State's attention. Exh. AA, attached to Meagher Affidavit, Doc. 32, at 36–39. Nothing in the record indicates that Anheuser–Busch's treatment of Martin and Yohman could be characterized as anything approaching gross irresponsibility.

Plaintiff further alleges that the conduct of Anheuser–Busch in negotiating the Consent Order and Plea Agreement following the investigation demonstrates an intent to exonerate itself and all personnel other than plaintiff, Moore, and Cordell from responsibility in connection with the treatment plant violations. Plaintiff's Mem. of Law, Doc. 36, at 36–37. However, given Anheuser–Busch's conclusion that culpability warranting termination was limited to those three individuals, such a stance is hardly surprising. And plaintiff has presented no evidence that she, Moore, and Cordell were identified for termination before the investigation pointed toward their responsibility.

In summary, plaintiff has brought forth no evidence demonstrating that a genuine issue exists as to grossly irresponsible conduct on the part of defendants either in conducting or reporting the results of their investigation.

In arguing that defendants acted in a grossly irresponsible manner, plaintiff places substantial emphasis upon the decision in *Greenberg v. CBS, Inc.,* 69 A.D.2d 693, 419 N.Y.S.2d 988 (2d Dep't 1979), in which the plaintiff sued CBS for libel based on an interview by Mike Wallace on the television news magazine "60 Minutes". Wallace's interviewee stated that she was under the care of the plaintiff, a physician, for weight loss, and that "under his direction" she was taking "80 pills a day," some of which were amphetamines, which gave her "strange experi-

ence[s]" and which she claimed caused birth defects in her daughter. *Greenberg,* 419 N.Y.S.2d at 990–91.

The *Greenberg* court found virtually no evidence on the record establishing defendant's attempts to verify the statements in question, and concluded that in the course of the investigation "many of the elementary questions were not asked." *Greenberg,* 419 N.Y.S.2d at 998. Applying the *Chapadeau* standard, the court found it significant "that at no time was [the interviewee] asked about her medical history, when her treatment ended, for a list of the medications prescribed by [plaintiff] or for copies of her prescriptions." *Greenberg,* 419 N.Y.S.2d at 995–96. The *Greenberg* court concluded that under the *Chapadeau* test, defendants' motion for summary judgment should be denied.

Plaintiff in the case at bar argues that defendants similarly failed to ask such "elementary questions" through the course of their internal investigation, arguing that the alleged deficiencies in the investigation amount to gross irresponsibility on the part of defendants. However, the *Greenberg* case is clearly distinguishable based upon the manner in which the investigation in that case was conducted and reported. In *Greenberg,* CBS's only attempts to verify the statements in question were informal interviews with six of Dr. Greenberg's other patients, which were unsworn and remained off the record. CBS did not seek to obtain any documentary evidence, such as copies of Dr. Greenberg's prescription forms, and did not speak with other physicians or pharmacists in the area in order to verify the reported statements. CBS did not even give Dr. Greenberg the opportunity to respond to the statements before they were reported. *Greenberg,* 419 N.Y.S.2d at 995–96. In short, the record in *Greenberg* reveals an investigation that was conducted hastily and superficially, and included wholly insufficient efforts to verify the relevant statements before making them public. Conversely, as discussed above at great length, defendants in the case at bar have presented substantial evidence as to the rigor and thoroughness of their internal investigation. Therefore, the court concludes that the facts in *Greenberg* are suffi-

ciently distinguishable from the facts in the case at bar.

The internal investigation in the instant case bears a much stronger resemblance to that in *Post v. Regan*, 677 F.Supp. 203 (S.D.N.Y.), *aff'd mem.*, 854 F.2d 1315 (2d Cir.1988), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989). In that case, plaintiff, a former employee of the defendant, an insurance brokerage, had been the supervisor of another employee who had made unauthorized investments of the brokerage's funds, resulting in the loss of over $100 million. When the situation was discovered, the chairman of the brokerage ordered an internal investigation by, among others, both inside and outside counsel. The plaintiff in that case was terminated as a result of the findings of the investigation.

At the annual shareholders meeting of the brokerage, the chairman read from written remarks concerning the losses. He noted that, "unknown to senior management, certain individuals" in the company "had engaged in unauthorized trading and financing activities and concealed it by entering incorrect investment data into the record-keeping system." *Post*, 677 F.Supp. at 205. He blamed poor supervision in part, and said that accordingly some of the company's supervisory personnel had been terminated. In response to a question following the meeting, he identified the plaintiff as among those who had been dismissed. *Post*, 677 F.Supp. at 205.

The employee sued for wrongful termination and defamation, claiming that the statements by the chairman falsely accused him of having taken part in the admitted wrongdoing, of having sought to cover it up, and implied that he had therefore been fired. *Post*, 677 F.Supp. at 207. Following discovery, defendants moved for summary judgment, which was granted in its entirety.

The *Post* court applied the *Chapadeau* test and, as here, the issue in *Post* became whether defendants had conducted and reported the results of their investigation in a grossly irresponsible manner, with plaintiff bearing the burden of proof on that issue. *Post*, 677 F.Supp. at 209; *see Luisi v. JWT Group, Inc.*, N.Y.L.J., Sept. 18, 1987, at 7, col. 3, 14

Media L.Rep. (BNA) 1731 [1732] (Sup.Ct.N.Y.County 1987). As in the case at bar, defendants' internal investigation in *Post* was conducted over a two month period, and included interviews of relevant parties and review of documents by inside and outside counsel, as well as corporate management. The *Post* court found that the defendants' internal investigation and subsequent reporting were conducted in a careful, responsible manner, and concluded that "based on the entire record, neither [defendant] acted in a grossly irresponsible manner, and plaintiff has not, by a preponderance of the evidence, shown that they did." *Post*, 677 F.Supp. at 209. The court granted summary judgment based on the *Chapadeau* standard, declining to decide whether the statements in issue were defamatory. *Id.*

Unlike the manifestly inadequate investigation at issue in *Greenberg*, defendants' investigation in the present case was conducted with the kind of thoroughness and rigor that was evidenced in *Post*. Based on the foregoing analysis, the court concludes that plaintiff has failed to raise a genuine issue of material fact as to grossly irresponsible conduct on the part of defendants in carrying out and reporting on their internal investigation. Plaintiff fails to carry the burden of proof required under *Chapadeau*. Accordingly, defendants' motion for summary judgment is GRANTED in so far as it addresses plaintiff's claim for defamation.

## CONCLUSION

Defendants' motions for summary judgment as to plaintiff's wrongful termination and defamation claims are GRANTED. Based on the foregoing, the Clerk of the Court is hereby directed to dismiss with prejudice plaintiff's complaint in its entirety.

It is so ORDERED.