Paula A. KONIKOFF, Plaintiff–Appellant,

v.

The **PRUDENTIAL INSURANCE COMPANY OF AMERICA,** Defendant–Appellee.

**Docket No. 99–9185.**

United States Court of Appeals, Second Circuit.

Argued April 26, 2000.

Decided Dec. 7, 2000.

Charles D. Schmerler, Golenbock, Eiseman, Assor & Bell, New York, NY, (Adam C. Silverstein, of counsel), for Plaintiff–Appellant.

Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, (Angela G. Garcia, of counsel), for Defendant–Appellee.

Before JACOBS, LEVAL, and SACK, Circuit Judges.

SACK, Circuit Judge:

The plaintiff, Paula Konikoff, a real estate appraiser, brought a lawsuit in the United States District Court for the Southern District of New York against the Prudential Insurance Company of America ("Prudential"). Prudential is the manager of two real-estate funds, PRISA and PRISA II (the "Funds"), for which Konikoff had provided appraisal services. Konikoff asserts in a single cause of action that Prudential injured her by disseminating to shareholders and the public at large a

report about the Funds' valuation practices prepared by independent counsel, and a transcript of answers by counsel to questions about the report, both of which defamed her. The district court (Michael H. Dolinger, *Magistrate Judge*[1]) granted summary judgment in favor of Prudential. *See Konikoff v. Prudential Ins. Co. of Am.*, No. 94 Civ. 6863(MBM)(MHD), 1999 WL 688460 (S.D.N.Y. Sept. 1, 1999).

The magistrate judge held that the communications at issue were protected by New York's common-law self-interest and common-interest privileges, neither of which was lost through the "actual malice" or common-law malice of Prudential. In the absence of New York law establishing that the common-law privileges attach to such broad public dissemination of defamatory statements, we decline to rest our holding on those grounds. We affirm, instead, because Prudential did not act with fault sufficient to permit liability under the standard promulgated by the New York Court of Appeals in *Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y.S.2d 61, 64 (1975). As a matter of law, Prudential's dissemination of the defamatory material under the circumstances presented was not "grossly irresponsible."

## BACKGROUND

*Facts*

Because summary judgment was granted against Konikoff, we consider the evidence in the light most favorable to her. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 710 (2d Cir.1996). From 1989 through 1993, Konikoff worked as a real estate appraiser for the firm of KPMG Peat Marwick. Prudential retained her as the outside appraiser of the office building located at 130 John Street in New York City. The building was part of the portfolio of PRISA II, a real estate

---

1. The parties consented to have Magistrate Judge Dolinger conduct all proceedings in this case, including the entry of judgment, pursuant to 28 U.S.C. § 636(c).

investment vehicle for pension funds administered by Prudential.

In 1993, Mark Jorgensen, the portfolio manager for PRISA and PRISA II, told Prudential executives that he believed Prudential portfolio managers had deliberately been causing appraisers to overvalue properties held by the Funds in order to inflate the Funds' performance statistics. Prudential retained the law firm of Howrey & Simon to investigate Jorgensen's claims. The firm found them to be unsubstantiated.

Jorgensen was then reassigned. In response, he filed suit against Prudential alleging that he had been retaliated against as a "whistle blower." The lawsuit was widely publicized, as were Jorgensen's allegations that Funds buildings, including 130 John Street, had been fraudulently over-appraised.

Prudential, alarmed by an unrelated investigation of its securities units, hired a law firm and an accounting firm to perform independent investigations of the Funds' valuation practices. The law firm, Sonnenschein Nath & Rosenthal ("Sonnenschein"), was retained to defend the Jorgensen suit and to "ascertain all of the facts concerning Prudential's management and operation of the valuation process of PRISA and PRISA II from 1987 … through 1993." The accounting firm, Kenneth Leventhal and Company, performed a valuation of PRISA and PRISA II properties. Sonnenschein found no evidence of a scheme to overvalue the PRISA and PRISA II portfolios. Leventhal determined, however, that twenty-six of the 143 appraisals it reviewed were unreasonable. It concluded that Konikoff's appraisal of 130 John Street for the fourth quarter of 1989 was reasonable, but that two later appraisals of the building performed by Konikoff, in 1990 and 1991, were unreasonable.

Concerned about the allegations in the Jorgensen suit, institutional investors threatened to withdraw from PRISA and PRISA II and various government agencies considered investigations. In an attempt to respond, Prudential made the Sonnenschein report available to them. The report was also sent to, *inter alia*, prospective investors, independent appraisers, and members of the media including *The New York Times, The Wall Street Journal, The Star–Ledger* (Newark, N.J.), and *Pensions and Investments*.

The Sonnenschein report concluded:

The evidence as a whole does not support a claim that the overvaluations which Leventhal ascribes to various property appraisals during this period were the result of undue influence upon appraisers or of improper appraiser bias. We found no evidence that any appraiser was threatened with removal if he or she failed to report a particular value or failed to move a value in a particular direction. We found no evidence that any appraiser was given special inducement to report a value favored by management.

The substantial body of evidence amassed here, *possibly excepting the disputed 130 John Street incident (a PRISA II property),* does not support a conclusion that independent appraisers were compromised or coerced by Prudential into reporting biased or false property values. The evidence we found does not support a finding that Prudential engaged in any scheme to report knowingly false and overstated property values.

The five independent appraisers interviewed—including those accounting for a substantial majority of the overvaluations claimed by Leventhal—unequivocally denied any undue pressure or influence upon them.

(emphasis added).

Konikoff claims that this language (the "Report Statement") defamed her by "possibly excepting the disputed 130 John Street incident" from its conclusion as to the absence of wrongdoing. Doing so, she argues, suggested to the reader that as the appraiser of 130 John Street, she may in

fact have been compromised or coerced by Prudential into reporting a biased or false property value.

The Sonnenschein report was first distributed at an April 28, 1994 meeting of PRISA and PRISA II investors held by Prudential. A few weeks later, Prudential held a second meeting at which investors were given the opportunity to ask questions of Reid Ashinoff, the Sonnenschein partner in charge of preparing the report. Prudential prepared a transcript of the questions and answers and distributed it to investors. According to the transcript, the following exchange occurred at the meeting:

Q. In its report, Sonnenschein appeared critical of certain appraisers. Does Sonnenschein recommend that Prudential take any further action with respect to certain appraisers?

A. No. No hard evidence suggests that the appraisers did not formulate their own conclusions or that the appraisers would not stick to their value conclusions. There is more than one way to view the evidence regarding the different appraisers. Consider 130 John Street by way of example. Peter Korpacz was replaced as the appraiser for 130 John Street because of differences between his and Prudential's approaches to that property's valuation. Mr. Korpacz, however, still appraises other PRISA properties and, thus, suffered no retribution on the part of Prudential with respect to his appraisal of 130 John Street. *When Paula Konikoff of KPMG Peat Marwick replaced Mr. Korpacz as the outside appraiser for 130 John Street, she came up with an appraised value under disputed factual circumstances from which one could argue circumstantially that the value conclusion was not reached independently.* All direct evidence, however, indicated that Ms. Konikoff's value conclusion was

reached independently. We understand that reasonable minds will differ as to what conclusions should be drawn. *Note also that two of the appraisers discussed in Sonnenschein's report—Paula Konikoff and Donald Duncan—no longer perform PRISA or PRISA II appraisals as a result of decisions made before the reports relating to the Jorgensen allegations were issued.*

(emphasis added).

Konikoff argues that this statement (with the Report Statement, collectively the "Statements") is defamatory because 1) it falsely asserts that circumstantial evidence indicated that her appraisal was not reached independently; and 2) it implies that Konikoff was fired by Prudential in connection with questions as to her appraisals when in reality she no longer performed appraisals for the Funds because she had left KPMG Peat Marwick to form her own firm.

*Procedural History*

Konikoff filed her complaint in the United States District Court for the Southern District of New York in September 1994. Prudential quickly moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. The district court (Michael B. Mukasey, *Judge*) denied the motion from the bench. The court found that for "an appraiser of real estate, whose reputation and livelihood depend on independent judgment and expertise, a suggestion that a specific valuation was the product of external pressure rather than reasoned deliberation disparages her professional capacities." If that is what the Report Statement suggested, then it was defamatory, according to the district court. The court also concluded that the statement in the question and answer session—that "one could argue circumstantially" that Konikoff was coerced into overvaluing 130 John Street—similarly attacked Konikoff's professional abilities because an average

listener or reader could conclude from the "juxtaposition" of Ashinoff's remarks that Konikoff "no longer works for Prudential" because she had "failed to render an independent appraisal." The district court held that because both Statements were "'reasonably susceptible'" of more than one meaning, the trier of fact would be required to "determine in what sense the words were used and understood" (quoting *Davis v. Ross,* 754 F.2d 80, 83 (2d Cir. 1985)). Finding it impossible to determine whether the potentially defamatory statements were privileged as a matter of law, the district court denied the motion to dismiss.

After agreeing to have the remainder of the proceedings heard by a magistrate judge, the parties engaged in extensive discovery. When it was completed, Prudential moved for summary judgment, arguing that the Statements were privileged. The magistrate judge agreed, holding in a lengthy opinion and order that under New York law the Statements were entitled to protection under both the "self-interest" and "common-interest" qualified common-law privileges. Concluding that there was no genuine issue as to a material fact bearing on whether those privileges had been abused and therefore lost by reason of the breadth of the publication of the Statements or by Prudential's "malice," the magistrate judge granted summary judgment in Prudential's favor.

On appeal, Konikoff proffers a single argument: that although the communications were privileged, there are triable questions of fact as to whether Prudential acted with "actual malice," i.e., whether it published the Statements with knowledge of their falsity or with reckless disregard for their truth, and therefore lost the benefit of the privilege.

Konikoff's argument is based largely on the technical definition of the word "bias" as it is employed in the appraisal industry. "Bias" appears in the conclusion of the Sonnenschein report addressing whether the "various property appraisals during the relevant] period were the result of undue influence upon appraisers or of *improper appraiser bias*" (emphasis added). Konikoff argues that "bias" is a term of art that means "corruption of the appraisal process by submission of a value which is outside a reasonable range *and* which cannot be supported by independent method" (emphasis added). A valuation is not biased under this definition, even if it is coerced or "biased" in the ordinary sense of the word, unless it cannot be supported by an independent valuation method. Konikoff argues that Prudential knew her valuations of 130 John Street could be independently supported, and that it therefore knowingly or recklessly published a falsehood when it indicated the possible presence of "improper appraiser bias."

## DISCUSSION

### I. Standard of Review and Choice of Law

We review the district court's grant of summary judgment *de novo,* construing the evidence in the light most favorable to the non-moving party. *See Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999). Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

While we may, of course, affirm on the same grounds relied on by the district

court if the record permits, "[i]t is beyond cavil that an appellate court may affirm the judgment of the district court on any ground appearing in the record." *Shumway v. UPS, Inc.*, 118 F.3d 60, 63 (2d Cir.1997).

■ The parties have clearly, if tacitly, agreed that New York law governs this litigation. *See Konikoff*, 1999 WL 688460, at *12 n. 7. Particularly in light of the plaintiff's residence in New York, the fact that the John Street property—the appraisal of which is at the heart of this suit—is located in New York, and the circulation of the Statements within New York,[2] we see no reason not to apply New York law. *See Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) (noting that "[n]o reason of policy warrants a departure from [the parties'] implied choice-of-law" during jury trial); *cf. Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 n. 5 (2d Cir.1998) ("Jurisdiction in this case is premised on diversity, and the parties both present arguments based on New York law, the law of the forum state. It is therefore appropriate for this Court to apply New York law.").

## II. Common Law Privilege

■ The magistrate judge granted summary judgment to Prudential by applying New York's law of qualified (or "conditional") privilege. New York common law affords qualified protection to defamatory "communication[s] made by one person to another upon a subject in which both have an interest." *Stillman v. Ford*, 22 N.Y.2d 48, 53, 238 N.E.2d 304, 306, 290 N.Y.S.2d 893, 897 (1968). There also appears to be a similar, albeit less developed, privilege covering a speaker's communications designed to protect the speaker's own legitimate interests. *See British Am. & E. Co. v. Wirth Ltd.*, 592 F.2d 75, 81 (2d Cir.1979); Restatement (Second) of Torts § 594 (1977).[3] The magistrate judge concluded that the Statements were covered by both of these privileges. *See Konikoff*, 1999 WL 688460, at *14.

■ If a defamatory communication is conditionally privileged, the plaintiff may nonetheless prevail by establishing that it was published excessively, i.e., it was made to persons with an insufficient interest in it for it to warrant protection, *see Stukuls v. State*, 42 N.Y.2d 272, 281, 366 N.E.2d 829, 835, 397 N.Y.S.2d 740, 746 (1977) (citing Restatement (Second) of Torts § 604 (1977)), or that it was made with "malice," *see Liberman v. Gelstein*, 80 N.Y.2d 429, 437–38, 605 N.E.2d 344, 349–50, 590 N.Y.S.2d 857, 862–63 (1992).[4]

■ "Malice" sufficient to defeat qualified privilege may be *either* of the common law *or* of the constitutional variety. *See id.* Common-law malice "mean[s] spite or ill will," *id.* at 437, 605 N.E.2d at 349, 590 N.Y.S.2d at 862, and will defeat the privilege only if it is " 'the one and only cause for the publication,' "

---

2. *See, e.g., Machleder v. Diaz*, 801 F.2d 46, 52 (2d Cir.1986), *cert. denied* 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987) (holding that false-light invasion of privacy case was governed by law of state in which plaintiff resided and in which defendant conducted and disseminated results of the investigation that formed the subject of the lawsuit).

3. Section 594 of the Restatement provides:
An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
(a) there is information that affects a sufficiently important interest of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

4. It is sometimes said that to defeat a qualified privilege, a plaintiff must show both that a communication is false and that the defendant abused the privilege. *See, e.g., Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 62 (2d Cir.1993). Inasmuch as Konikoff must in any event prove falsity in order to establish her cause of action for defamation, *see Flamm v. American Ass'n of Univ. Women*, 201 F.3d 144, 148 (2d Cir.2000), falsity as a separate element for divestiture of the privilege here is redundant.

*id.* at 439, 605 N.E.2d at 350, 590 N.Y.S.2d at 863 (quoting *Stukuls,* 42 N.Y.2d at 282, 366 N.E.2d at 835, 397 N.Y.S.2d at 746). Constitutional or "actual" malice means publication " 'with [a] high degree of awareness of [the publication's] probable falsity' " or while " 'the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Id.* at 438, 605 N.E.2d at 350, 590 N.Y.S.2d at 863 (quoting, respectively, *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (first and third brackets in original). The critical difference between common-law malice and constitutional malice, then, is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth. *See, e.g., Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1433 (8th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990); *Carson v. Allied News Co.,* 529 F.2d 206, 209 (7th Cir.1976).

The district court concluded that the audience for Prudential's publication of the Statements was appropriate and that the privilege was therefore not abused by excessive publication. *See Konikoff,* 1999 WL 688460, at \*18-\*22. As for malice, the court first noted that the plaintiff did not seriously contend that the Statements were made solely out of spite or ill will, i.e., with common-law malice sufficient to defeat the privilege. *See id.* at \*24. The Statements therefore did not lose their privilege on that account. After extensive analysis, the court concluded that as a matter of law, the Statements also had not been published with "actual malice" because Prudential neither knew the State-

ments were false nor entertained serious doubts as to their truth at the time it disseminated them. *See id.* at \*22-\*33.

We do not quarrel with the magistrate judge's conclusion as to absence of malice. Whether the privileges apply in these circumstances, however, presents a close question, one that New York courts have not yet resolved. Whereas Prudential communicated the Statements to the world at large through the media, the common-interest and self-interest privileges have traditionally been "tightly confined to cases in which the alleged defamatory statements were published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees." Theodore J. Boutrous, Jr., *Why an Expanded Common-law Privilege Should Also Protect the Media,* Communications Lawyer, Spring 1997, at 9 (citing *Brown v. Kelly Broadcasting Co.,* 48 Cal.3d 711, 727, 257 Cal. Rptr. 708, 716, 771 P.2d 406, 414 (1989)). There is authority in other jurisdictions for expanding the privilege to include communications to the general public through the press. *See, e.g., Richmond v. Southwire Co.,* 980 F.2d 518, 520 (8th Cir.1992) (small-town employer's release to media of report on employee dishonesty protected by self-interest privilege under Arkansas law) (citing *Straitwell v. National Steel Corp.,* 869 F.2d 248, 250-52 (4th Cir.1989) (common-interest privilege applicable in similar circumstances under West Virginia law)).[5] Courts applying New York law, however, have not extended the privilege to cover publication of defamatory statements through the media to the world at

**5.** *See also McClure v. American Family Mut. Ins. Co.,* 223 F.3d 845, 854 (8th Cir.2000) (Minn. law); *Palmisano v. Allina Health Sys., Inc.,* 190 F.3d 881, 885 (8th Cir.1999) (Minn. law); *Merlo v. United Way of Am.,* 43 F.3d 96, 104-05 (4th Cir.1994) (Fla. and Va. law); *Gallo v. Princeton Univ.,* 281 N.J.Super. 134, 143-46, 656 A.2d 1267, 1272-74 (1995); *Olson v. 3M Co.,* 188 Wis.2d 25, 36-38, 523

N.W.2d 578, 582-83 (1994). *But see Draghetti v. Chmielewski,* 416 Mass. 808, 814, 626 N.E.2d 862, 867-68 (1994) (refusing to apply privilege because it "would create a privilege for virtually all newsworthy statements"); *Brown v. Kelly Broadcasting Co.,* 48 Cal.3d 711, 738, 257 Cal.Rptr. 708, 724, 771 P.2d 406, 422 (1989) (declining to apply statutory version of the privilege to press publications).

large.[6]

Application of the self-interest or common-interest privilege in this case could have significant ramifications. It might, for example, be read as extending the privileges to *all* defensive statements to and through the media made by people and entities that deal with the general public, on the theory that all such communications are either in the legitimate self-interest of the speaker or in the common interest of the speaker and the general investing or consuming public. There is no apparent reason for the privilege, expanded in this manner, to be limited to the somewhat unusual circumstances before us: the republication by a defendant of statements contained in independent reports generated by outsider lawyers, accountants or other consultants. Similar protection would likely follow for defamatory statements generated by defendants themselves in response to assertions of their wrongdoing.

It is also difficult to see why the common-interest privilege thus broadly applied would not protect media defendants from liability for statements they publish and broadcast about private persons, since members of the media share with their audience a common interest in the events of the day. *See* Boutrous, *supra*, at 10. Under that rationale, private plaintiffs seeking to hold members of the press liable for defamatory articles or broadcasts would be required to establish common-law or constitutional malice on the part of the defendant. That result is difficult to square with the prevailing rule established by the New York Court of Appeals that private plaintiffs must show that the de-

fendant was grossly irresponsible to establish liability. *See Chapadeau v. Utica Observer–Dispatch, Inc.*, 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571, 379 N.Y.S.2d 61, 64 (1975).

We do not hold that the common-law privileges are unavailable with respect to communications by and through the media under New York law, nor even that they do not protect Prudential in the case at bar. Were we forced to reach the issue, we might be inclined to certify to the New York Court of Appeals the question whether New York common-law privilege covers statements to the general public under the circumstances of this case. We decline to do so, however, because we can affirm the judgment of the district court on different and firmer footing: the *Chapadeau* standard.

### III.  Analysis under *Chapadeau*

A.  *Development of the* Chapadeau *Standard*

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that for a public official to succeed in a defamation suit, the First Amendment requires that he or she first establish with "convincing clarity" that the defendant published a defamatory falsehood with "actual malice." *Id.* at 285–86, 84 S.Ct. 710. The Court later extended the same test to defamation suits brought by public figures. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335–36 & n. 7, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). As we noted above, the Supreme Court interpreted the term "actual malice"

---

**6.**  We are aware of only one New York decision, rendered by an intermediate appellate court, in which the common-interest privilege has been applied to statements made to the public through the media: *Lee v. City of Rochester*, 254 A.D.2d 790, 791–92, 677 N.Y.S.2d 848, 850–51 (4th Dep't 1998) (statement by a police officer to a newspaper about the scene of a shooting held subject to the common-interest privilege). The privilege was applied by the court in an unsigned memorandum decision without discussion. Although we are

generally bound "to apply the law as interpreted by New York's intermediate appellate courts ... unless we find persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion," *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir.1999), we are reluctant to accept the Fourth Department's casual, offhand application of the common-interest privilege as a binding interpretation of the law of New York.

to require proof that the defendant published a statement with knowledge of its falsity or "with [a] high degree of awareness of [the publication's] probable falsity," *Garrison,* 379 U.S. at 74, 85 S.Ct. 209, or while "the defendant in fact entertained serious doubts as to the truth of [the] publication," *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323. *See also Gertz,* 418 U.S. at 335 n. 6, 94 S.Ct. 2997 (1974) (requiring proof of "subjective awareness of probable falsity") (citing *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323).

In *Gertz,* decided some ten years after *Sullivan,* the Supreme Court turned to the question of what standard the First Amendment required private defamation plaintiffs to meet in defamation cases. The Court held, *inter alia,* "that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U.S. at 347, 94 S.Ct. 2997. The vast majority of states subsequently decided that the "appropriate standard of liability" left for them to decide by *Gertz* is negligence. *See Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 N.J. 392, 404 n. 1, 655 A.2d 417, 423 n. 1 (1995) (collecting state authority).

The New York State Court of Appeals, however, chose a different path. It held in *Chapadeau* that "where the content of the article is arguably within the sphere of legitimate public concern, which is reason-ably related to matters warranting public exposition, the party defamed may recover" if he or she can establish "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau,* 38 N.Y.2d at 199, 341 N.E.2d at 571, 379 N.Y.S.2d at 64.[7]

*Chapadeau* itself was about the liability of a newspaper publisher for a statement contained in a published article, and the court's invocation of the terms "publisher" and "standards of information gathering and dissemination" suggest that the gross irresponsibility standard may apply only to cases against media defendants. Courts applying New York law have, however, uniformly applied *Chapadeau* to cases involving non-media defendants, at least where the communication at issue admits of measurement by the *Chapadeau* standard. *See, e.g., McGill v. Parker,* 179 A.D.2d 98, 108, 582 N.Y.S.2d 91, 97 (1st Dep't 1992) (noting that while "a standard which requires a showing that the publisher of defamatory material 'acted in a grossly irresponsible manner ...' is particularly suited to a media defendant," there "is no reason ... why the Constitution should be construed to provide greater protection to the media in defamation suits than to others exercising their freedom of speech") (citation omitted). Other cases to

---

**7.** The *Chapadeau* test was apparently adapted from one proposed for public-figure cases by Justice Harlan in *Curtis Publ'g Co. v. Butts,* seven years before *Gertz,* but never adopted by the Supreme Court: "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *see also Gaeta v. New York News Inc.,* 95 A.D.2d 315, 330 n. 3, 466 N.Y.S.2d 321, 330 n. 3 (1st Dep't 1983) (Kupferman, J.P., dissenting), *rev'd,* 62 N.Y.2d 340, 465 N.E.2d 802, 477 N.Y.S.2d 82 (1984) (noting the kinship between the *Chapadeau* and Harlan tests.) Justice Harlan reasoned:

It is the conduct element ... on which we must principally focus if we are successfully to resolve the antithesis between civil libel actions and the freedom of speech and press. Impositions based on misconduct can be neutral with respect to content of the speech involved, free of historical taint, and adjusted to strike a fair balance between the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood.

*Butts,* 388 U.S. at 153, 87 S.Ct. 1975.

the same effect are collected in the margin.[8] The *Chapadeau* standard therefore applies to this suit by private plaintiff Konikoff against non-media defendant Prudential about the statements by Prudential concerning appraisals of property, a subject "arguably within the sphere of legitimate public concern."[9] *Chapadeau,* 38 N.Y.2d at 199, 341 N.E.2d at 571, 379 N.Y.S.2d at 64.

## B. Application of the Chapadeau Standard

The situation presented by this appeal is hardly unique. It is not at all uncommon for a business entity to respond to charges of wrongdoing by preparing or commissioning from counsel or other experts a report on the allegations which is then disseminated to its shareholders, employees and the general public.[10]

**8.** *See also Rubenstein v. Manhattan and Bronx Surface Operating Auth.,* No. CV–96–902, 1997 WL 833456, at *5–7 (E.D.N.Y. Oct.8, 1997); *Mott v. Anheuser–Busch, Inc.,* 910 F.Supp. 868, 875 (N.D.N.Y.1995), *aff'd mem.,* 112 F.3d 504 (2d Cir.1996); *Naantaanbuu v. Abernathy,* 816 F.Supp. 218, 229 (S.D.N.Y. 1993); *J & J Sheet Metal Works, Inc. v. Picarazzi,* 793 F.Supp. 1104, 1112 (N.D.N.Y.1992); *McNally v. Yarnall,* 764 F.Supp. 838, 847–48 (S.D.N.Y.1991); *Post v. Regan,* 677 F.Supp. 203, 208 (S.D.N.Y.), *aff'd mem.,* 854 F.2d 1315 (2d Cir.1988), *cert. denied,* 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989); *Hammerhead Enters., Inc. v. Brezenoff,* 551 F.Supp. 1360, 1369 n. 7 (S.D.N.Y.), *aff'd,* 707 F.2d 33 (2d Cir.1983), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); *Mahoney v. State of New York,* 236 A.D.2d 37, 40 n. 1, 665 N.Y.S.2d 691, 693 n. 1 (3d Dep't 1997); *Park v. Capital Cities Communications, Inc.,* 181 A.D.2d 192, 197–98, 585 N.Y.S.2d 902, 906 (4th Dep't 1992); *Pollnow v. Poughkeepsie Newspapers,* 107 A.D.2d 10, 16, 486 N.Y.S.2d 11, 16 (2d Dep't 1985), *aff'd,* 67 N.Y.2d 778, 492 N.E.2d 125, 501 N.Y.S.2d 17 (1986); *Rupert v. Sellers,* 65 A.D.2d 473, 482–83, 411 N.Y.S.2d 75, 81 (4th Dep't 1978), *aff'd,* 50 N.Y.2d 881, 430 N.Y.S.2d 263, 408 N.E.2d 671, *cert. denied,* 449 U.S. 901, 101 S.Ct. 272, 66 L.Ed.2d 132 (1980); *Luisi v. JWT Group, Inc.,* N.Y.L.J., Sept. 18, 1987, at 7, col. 3, 14 Media L. Rep. (BNA) 1732, 1733–34 (N.Y.Sup.Ct.1987), *aff'd w/o opinion,* 138 A.D.2d 987, 525 N.Y.S.2d 454 (1st Dep't), *appeal denied,* 72 N.Y.2d 803, 528 N.E.2d 520, 532 N.Y.S.2d 368 (1988).

**9.** In media cases, the scope of what is "arguably within the sphere of public concern" has been held to be extraordinarily broad with great deference paid to what the publisher deems to be of public interest. *See, e.g., Chaiken v. VV Publishing Corp.,* 119 F.3d 1018, 1032 (2d Cir.1997) ("New York courts generally defer to publishers' judgment as to what subjects are matters of public concern"), *cert. denied,* 522 U.S. 1149, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); *Huggins v. Moore,* 94 N.Y.2d 296, 303, 726 N.E.2d 456, 460, 704 N.Y.S.2d 904, 908 (1999) ("Absent clear abuse, the courts will not second-guess edito-

rial decisions as to what constitutes matters of genuine public concern"); *Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 349, 465 N.E.2d 802, 805, 477 N.Y.S.2d 82, 85(1984) ("The *Chapadeau* standard . . . recognizes the need for judgment and discretion to be exercised by the journalists, subject only to review by the courts to protect against clear abuses.") Whether or not deference to the judgment of nonmedia defendants is quite so broad, there is no doubt that a public controversy about allegedly improper valuation of substantial investments made by a publicly held company fit the description. *See Mott v. Anheuser–Busch, Inc.,* 910 F.Supp. 868, 874 (N.D.N.Y. 1995), *aff'd mem.,* 112 F.3d 504 (2d Cir.1996) (issues involving alleged water pollution by defendant arguably within the sphere of public concern); *Post v. Regan,* 677 F.Supp. 203, 208 (S.D.N.Y.), *aff'd mem.,* 854 F.2d 1315 (2d Cir.1988), *cert. denied,* 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989) (unauthorized transactions conducted by the defendant insurance brokerage arguably within the sphere of public concern); *Luisi v. JWT Group, Inc.,* N.Y.L.J., Sept. 18, 1987, at 7, col.3, 14 Media L. Rep. (BNA) 1732 (Sup.Ct. N.Y. County 1987), *aff'd w/o opinion,* 138 A.D.2d 987, 525 N.Y.S.2d 454 (1st Dep't), *appeal denied,* 72 N.Y.2d 803, 532 N.Y.S.2d 368, 528 N.E.2d 520 (1988) (allegedly improper accounting practices by defendant's employee arguably within the sphere of public concern).

**10.** *See, e.g.,* Alec Koch, Note, *Internal Corporate Investigations: The Waiver of Attorney–Client Privilege and Work–Product Protection Through Voluntary Disclosures to the Government,* 34 Am.Crim.L.Rev. 347, 347 (1997) ("Internal corporate investigations by outside counsel are now commonplace."); Ralph C. Ferrara, *et al., Internal Corporate Investigations and the SEC's Message to Directors in Cooper Co.,* 65 U.Cin.L.Rev. 75, 76 n. 6, 84–85 (1996) (noting that internal investigations of alleged misconduct have become an "important tool of management," and frequently involve use of outside counsel or accountants) (internal quotation marks omitted); Wendy C. Schmidt and Jonny J. Frank, *Internal Investigations: The Outsourcing Option,* N.Y.L.J., July 8, 1996, at S1 ("An emerging trend is to

Prudential commissioned the Sonnenschein report to investigate the Jorgensen allegations. While there is some minor skirmishing between the parties about the extent of Prudential's involvement in the report's preparation, there is no evidence to suggest that in commissioning the report Prudential acted other than responsibly. It hired a well-respected law firm and a well-respected accounting firm to conduct parallel investigations. The magistrate judge found that Sonnenschein "interviewed approximately 85 current and former Prudential employees and outside appraisers, including Ms. Konikoff, and reviewed 50,000 documents." *Konikoff*, 1999 WL 688460, at *4. The Sonnenschein report contains the uncontradicted statement that Sonnenschein received "complete and unfettered access to all Prudential records and personnel." *Cf. Lewis v. Newsday, Inc.*, 246 A.D.2d 434, 436, 668 N.Y.S.2d 377, 379 (1st Dep't 1998) (holding that newspaper's publication of statements from sources who were "mere conduits for unverified rumor" raised a triable issue of fact as to whether newspaper was "grossly irresponsible" where it made no effort to substantiate statements and sources made no representation that they had done so).

There also is no indication that Prudential was grossly irresponsible in disseminating the statements. On the contrary, it was plainly reasonable for Prudential to publish the full text of the independent report it had commissioned and the transcript of the related question and answer session in response to demands by investors and governmental agencies that Prudential address the charges. The purpose of releasing these documents was to inform the public about the assessment by independent investigators of the allegations against the company. Prudential could hardly have edited the reports to omit information *Prudential* thought to be inaccurate while honoring its goal of publicly disclosing, *in haec verba*, what *Sonnenschein* thought to be the facts. Pru-

dential's censorship of the reports, even for the purpose of sparing the reputation of third parties, would have undermined its justifiable objective of baring all that the investigators had to say about the results of their inquiry.

Courts addressing cases strikingly similar to the case at bar have held the defendants' publications to be protected by the *Chapadeau* principle.

In *Post v. Regan*, 677 F.Supp. 203 (S.D.N.Y.), *aff'd mem.*, 854 F.2d 1315 (2d Cir.1988), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989), the defendant insurance brokerage responded to reports of unauthorized transactions by the plaintiff's subordinate by conducting an investigation, using internal investigators and an external auditor. The investigation revealed extensive misconduct and significant concealed losses. The defendant announced the results of the investigation at a shareholders' meeting and stated that certain employees, including the plaintiff, had been terminated as a result of the investigation. Several major newspapers reported the results of the investigation and the defendants' statements. The United States District Court for the Southern District of New York dismissed the plaintiff's defamation suit under *Chapadeau*, concluding that the firm's losses were a matter of public interest and that there was no evidence that the defendants "conducted and reported the results of their investigation in a grossly irresponsible manner." *Id.* at 209, 379 N.Y.S.2d 61, 341 N.E.2d 569. The court emphasized that the investigation "was not done hastily" and "involved interviews of relevant parties" and thorough reviews of the allegedly wrongful transactions. *Id.* We affirmed in an unpublished summary order. *See* 854 F.2d 1315 (2d Cir.1988) (table).

In *Mott v. Anheuser-Busch, Inc.*, 910 F.Supp. 868 (N.D.N.Y.1995), *aff'd mem.*, 112 F.3d 504 (2d Cir.1996), the defendant initiated an investigation into published allegations that its employees had defrauded

outsource the investigation to an independent    investigative firm[.]'").

a state environmental agency. The investigation confirmed that the plaintiff and others had indeed engaged in wrongdoing. The defendant released the results of the investigation in press releases and made several related statements to reporters. The district court granted summary judgment for the defendant under *Chapadeau.* Noting that the investigation was conducted with the help of respected outside legal counsel and involved extensive review of the pertinent documents, *id.* at 875–76, the court concluded that the "investigation and subsequent reporting were carried out in a thorough and responsible manner," *id.* at 875. We again affirmed in an unpublished summary order. *See* 112 F.3d 504 (2d Cir.1996) (table).

And in *Luisi v. JWT Group, Inc.,* N.Y.L.J., Sept. 18, 1987, at 7, col. 3, 14 Media L. Rep. (BNA) 1732 (N.Y.Sup. 1987), *aff'd w/o opinion,* 138 A.D.2d 987, 525 N.Y.S.2d 454 (1988), *appeal denied,* 72 N.Y.2d 803, 528 N.E.2d 520, 532 N.Y.S.2d 368 (1988), relied upon by the district courts in both *Post,* 677 F.Supp. at 208, 209, and *Mott,* 910 F.Supp. at 878, the defendant advertising agency retained an external accounting firm to help investigate allegedly improper accounting practices by the plaintiff, a former employee, and others. When the investigation was concluded, the defendant issued a press release stating that the plaintiff was responsible for "improper activities" that contributed to a $30 million loss in revenues. *Luisi,* 14 Media L. Rep. at 1733. Applying *Chapadeau,* the trial court granted summary judgment for the defendant on the ground that the statements were in the public interest and the plaintiff had failed to show that the defendant had acted with "gross irresponsibility." *Id.* at 1733–34. The court noted that the statements were made solely in reliance on the outside investigators' report and that the report was prepared with due care and thoroughness. *Id.* at 1734.

We see no legally significant distinction between those cases and the case at bar.

The plaintiff points us to statements by courts indicating that the *Chapadeau* test is less difficult for a plaintiff to meet than the "actual malice" standard. As we have said, we doubt a triable issue of fact exists as to "actual malice."

More important, we think that the "actual malice" and *Chapadeau* tests are different from one another rather than the first simply being a more onerous version of the second from the plaintiff's perspective. Ordinarily a communication made with "actual malice" is also made in violation of the *Chapadeau* standard because ordinarily it is grossly irresponsible to make a defamatory statement knowing that it is false or while highly aware that it is probably false. But that is not necessarily the case. There are situations in which a statement may be published with awareness of its probable falsity under the *Sullivan* line of cases and yet neither in a grossly irresponsible manner nor without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties under *Chapadeau.* If, for example, a television station were to rebroadcast a public official's news conference despite the broadcaster's knowledge that one of the speaker's statements, a defamatory one, was likely false, the rebroadcast would arguably have been made "with subjective awareness of probable falsity" of the defamatory remarks—"actual malice"—yet in accordance with standards of responsible journalism under *Chapadeau.*

We understand that an anomaly seems to emerge: A publication about a private figure might not be actionable under *Chapadeau,* while an identical publication about a public figure *would* be actionable under *Gertz.* This would be a rather startling result in view of the higher protection for statements about public figures that the Supreme Court thought it was estab-

lishing in *Gertz*.[11]

The solution to this apparent dilemma must, of course, await its presentation to a court in justiciable form. We note, however, that the anomaly may be more apparent than real. If presented with a case that is similar to the case at bar but is brought by a public official or public figure rather than a private person like Konikoff, New York courts may conclude that the plaintiff must establish gross irresponsibility under *Chapadeau* in addition to "actual malice" under *Sullivan* in order to recover. The "actual malice" requirement promulgated by the Supreme Court for public-official and public-figure libel suits constitutes only the level of protection for defamation defendants required by the United States Constitution. It is a minimum standard. New York State is plainly free under its own law to superimpose the *Chapadeau* test on the "actual malice" standard in appropriate cases in order to increase the defendants' protection or to harmonize the protection available to defendants in public-plaintiff suits with that available to defendants in private-plaintiff suits. *See Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 248–52, 567 N.E.2d 1270, 1277–80, 566 N.Y.S.2d 906, 913–16 (1991)

(holding that the New York State Constitution independently provides protection for statements of opinion greater than those required by the First Amendment); *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521, 528–29 & n. 3, 523 N.E.2d 277, 280 & n. 3, 528 N.Y.S.2d 1, 4 & n. 3 (1988) (holding that the New York State Constitution protects journalists' nonconfidential source material from disclosure even if the federal constitution does not, and remarking that "[t]he protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the First Amendment.").

In any event, where, as here, a defendant publishes in its entirety a report prepared by an outside investigator examining allegations of the defendant's wrongdoing in order to inform government agencies and the public of the investigator's conclusions, the question is not whether the defendant knew or was aware of the probability that some statement in it was false, but whether the defendant acted responsibly in selecting and interacting with the investigator and disseminating the results as a whole.[12] The Supreme Court in *Gertz*

**11.** We are also aware that it follows from application of the *Chapadeau* standard in these circumstances that we read *Chapadeau* to imply a form of neutral reportage protection here. This Court adopted such protection for public figure plaintiffs in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) ("[W]hen a responsible, prominent organization ... makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity."). While the New York Court of Appeals rejected the existence of a neutral reportage privilege for private plaintiffs in *Hogan v. Herald Co.*, 84 A.D.2d 470, 478–79, 446 N.Y.S.2d 836, 842 (4th Dep't), *aff'd on op. below*, 58 N.Y.2d 630, 444 N.E.2d 1002, 458 N.Y.S.2d 538 (1982), it has also held that defendants who would otherwise be protected by such a privilege may by protected under *Chapadeau* instead, *see Weiner v. Doubleday & Co., Inc.*, 74 N.Y.2d 586, 594–95,

549 N.E.2d 453, 456–57, 550 N.Y.S.2d 251, 254–55 (1989).

**12.** It should be noted on this score that the New York Court of Appeals has explicitly acknowledged that *Chapadeau* may in some circumstances be more protective of a defendant than is *Sullivan*. In *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 465 N.E.2d 802, 477 N.Y.S.2d 82 (1984), the court observed that summary judgment might be more easily obtainable by a defendant in private plaintiff cases than in public plaintiff suits.

"[W]hile it may be argued that libel suits involving public figures are inappropriate for summary judgment because a plaintiff must demonstrate the subjective state of mind of the defendant, which does not readily lend itself to summary disposition, here the standard may be satisfied by wholly objective proof. Defendant[], like any other litigant[], should not be denied summary judgment when an insufficient showing has been made in opposition to [its] motion."

explicitly left it to "the States [to] define for themselves the appropriate standard of liability" in private plaintiff cases. 418 U.S. at 347, 94 S.Ct. 2997. The State of New York adopted as that standard "gross irresponsib[ility]." *Chapadeau,* 38 N.Y.2d at 199, 341 N.E.2d at 571, 379 N.Y.S.2d at 64. As a matter of law, it was not grossly irresponsible for Prudential to publish the Statements. The district court was therefore correct in granting summary judgment to Prudential.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

*Id.* at 350–51, 465 N.E.2d at 806, 477  N.Y.S.2d at 86 (citations omitted).