GABRIEL CAPITAL, L.P., a Delaware Limited Partnership, and Ariel Fund Ltd., a Cayman Islands Corporation, Plaintiffs,

v.

NATWEST FINANCE, INC., f/k/a Gleacher Natwest Inc.; Natwest Capital Markets Limited; National Westminster Bank PLC; McDonald Investments Inc, f/k/a McDonald & Company Securities, Inc.; and Steel Dynamics Inc., Defendants.

No. 99 CIV. 10488(SAS).

United States District Court, S.D. New York.

Oct. 4, 2001.

James R. Safley, Esq., Thomas B. Hatch, Esq., Randall Tietjen, Esq., Corey L. Gordon, Esq., Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, David G. Glasser, Esq., Levin & Glasser, P.C., New York City, for Plaintiffs.

Adam Ziffer, Esq., Frank C. Razzano, Esq., Howard Schiffman, Esq., Adam Proujansky, Esq., Dickstein Shapiro Morin & Oshinsky LLP, Michael T. Tomanio, Jr., Esq., Sullivan & Cromwell, Ian Hochman, Esq., Willkie Farr & Gallagher, W. Patrick Loughlin, Esq., Latham & Watkins, New York City, for Defendants.

### MEMORANDUM OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs Gabriel Capital, L.P. ("Gabriel Capital") and Ariel Fund Ltd. ("Ariel Fund") sued defendants NatWest Finance, Inc. ("NatWest"), McDonald Investments Inc. ("McDonald"), and Steel Dynamics Inc. ("SDI") for securities fraud arising from plaintiffs' purchase of bonds issued by a Thailand corporation, Nakornthai Strip Mill Public Company Limited (the "NSM Notes").[1] Plaintiffs alleged that NatWest violated section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by making or participating in the making of untrue statements and by omitting material facts in order to induce plaintiffs to purchase the NSM Notes. Plaintiffs also alleged that through the same conduct, NatWest committed common law fraud, conspired to commit fraud, and aided and abetted fraud in violation of New York law.

On May 8, 2000, this Court denied NatWest's and McDonald's motion to dismiss plaintiffs' first Amended Complaint and granted in part and denied in part SDI's motion to dismiss. See Gabriel Capital, L.P. v. NatWest Finance, Inc., 94 F.Supp.2d 491, 512 (S.D.N.Y.2000) ("Gabriel I "). On May 30, 2000, plaintiffs filed their Second Amended Complaint ("SAC"), which added claims against two new defendants, NatWest Capital Markets Limited ("NatWest Capital") and National Westminster Bank PLC ("NatWest Bank"), and attempted to cure the deficiencies in the allegations against SDI. SDI, NatWest Capital and NatWest Bank moved to dismiss the SAC. These motions were also denied. See Gabriel Capital, L.P. v. NatWest Finance, Inc., 122 F.Supp.2d 407, 437 (S.D.N.Y.2000) ("Gabriel II ").

Currently before this Court is a motion for summary judgment brought by NatWest, NatWest Capital and NatWest Bank

---

1. Defendants McDonald and SDI have since been voluntarily dismissed from this lawsuit pursuant to Rule 41 of the Federal Rules of Civil Procedure.

(collectively the "NatWest defendants" or "defendants") seeking to dismiss all aspects of the SAC that rely upon any alleged misrepresentations contained in the Offering Memorandum and conveyed during the "road show" presentation.[2] The NatWest defendants claim that plaintiffs cannot prove that they relied on such misrepresentations and that summary judgment in their favor should be granted. For the following reasons, defendants' motion is granted in part and denied in part.

## I. BACKGROUND

The allegations in the Amended Complaint have already been exhaustively summarized in *Gabriel I, see* 94 F.Supp.2d at 495–98, as have the allegations in the SAC, *see Gabriel II,* 122 F.Supp.2d at 411–17. Familiarity with both opinions and the facts contained therein is assumed for purposes of this motion. For the sake of brevity, only the facts uniquely relevant to this motion will be reiterated.

### A. The Alleged Misrepresentations

Plaintiffs allege that the NatWest defendants made misrepresentations in both the Offering Memorandum and the road show presentation concerning the following:

(i) the status of the hot mill, *see* SAC ¶¶ 25 and 26;

(ii) the design of the mini-mill, *see id.* ¶¶ 27 and 28;

(iii) the ability of NSM to secure an adequate supply of scrap metal, *see id.* ¶¶ 29 and 30;

(iv) the existence of "off-take" agreements, *see id.* ¶¶ 31 and 32; and

(v) the management of NSM, *see id.* ¶¶ 33–35.

Additionally, plaintiffs allege that the Offering Memorandum contained misrepresentations concerning the use of proceeds from the Offering. *See id.* ¶¶ 36 and 37

### B. Evidence Concerning Reliance

#### 1. The Offering Memorandum

Gabriel Capital admits that it was provided with the March 2, 1998 Offering Memorandum after "March 2, 1998 (i.e. after Gabriel had made its investment decision)" to purchase the NSM Notes.[3] Plaintiffs' Response to the NatWest Defendants' Statement of Material Facts Pursuant to Local Rule 56.1, ¶ 4. In the section entitled "Risk Factors," the Offering Memorandum states:

> An investment in the securities being offered by this Offering Memorandum involves a high degree of risk. In addition to the other information contained in this Offering Memorandum, the following factors, certain of which are not typically associated with investing in securities of companies located in the United States, should be carefully considered by prospective investors in evaluating an investment in the securities offered hereby.

Offering Memorandum, Ex. D to the Declaration of Andres Colon ("Colon Decl."), attorney for NatWest defendants, at 19.

---

**2.** The "road show" was the sales presentation recommending the purchase of NSM Notes made by various representatives of NatWest, McDonald and NSM to Jack Mayer, a Gabriel Capital portfolio manager, and Selin Cebeci–Gulcelik, a former analyst at Gabriel Capital who worked under Mayer's direction.

**3.** Plaintiffs allege that they "reviewed and relied upon the written materials provided to them by the defendants, as well as the oral representations made by the defendants, in making the decision to invest in the NSM Notes. Based upon these representations, on or about March 2, 1998, the plaintiffs together purchased $15.5 million in principal value of 12% NSM Senior Steel Mortgage Notes due 2006." SAC ¶ 18.

The Offering Memorandum then discloses in detail the types of risks that potential investors could face. *See id.* at 19–37. In addition, the Offering Memorandum contains the following disclaimers:

NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IS MADE BY THE INITIAL PURCHASERS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION SET FORTH HEREIN, AND NOTHING CONTAINED IN THIS OFFERING MEMORANDUM IS, OR SHOULD BE RELIED UPON AS, A PROMISE OR REPRESENTATION, WHETHER AS TO THE PAST OR THE FUTURE. THE INITIAL PURCHASERS DO NOT ASSUME ANY RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

.    .    .    .    .

THIS OFFERING MEMORANDUM INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE ISSUERS, THE COMPANY AND OTHER SOURCES BELIEVED BY THE ISSUERS AND THE COMPANY TO BE RELIABLE.... SUCH STATEMENTS, ESTIMATES AND PROJECTIONS REFLECT VARIOUS ASSUMPTIONS BY THE ISSUERS AND THE COMPANY CONCERNING ANTICIPATED RESULTS AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE ISSUERS AND THE COMPANY.... THE ISSUERS AND THE COMPANY MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETE-NESS OF SUCH STATEMENTS, ESTIMATES OR PROJECTIONS CONTAINED IN THIS OFFERING MEMORANDUM OR THAT ANY FORECAST CONTAINED HEREIN WILL BE ACHIEVED.

*Id.* at iii.

In addition to the above disclaimers that Mayer doubted he even reviewed, *see* Mayer Dep. at 243, there is little evidence that either Mayer or Cebeci–Gulcelik read, much less relied upon, the Offering Memorandum. For instance, Mayer could not recall whether he read parts of the Offering Memorandum or the Preliminary Offering Memorandum, but admitted that he did not fully read either document. *See* Deposition of Jack Mayer ("Mayer Dep."), Ex. C to the Andres Decl., at 52. Furthermore, Mayer basically conceded that he did not base his investment decision on the Offering Memorandum. He testified as follows:

Q. Did you do any independent analysis of NSM or did you rely on Ms. Cebeci for that?

A. I relied on Ms. Cebeci and my discussions with Ms. Cebeci as well as the presentation. Mostly the presentation.

*Id.* at 120. Cebeci–Gulcelik, who was opposed to the NSM investment from the start, fares no better. She stated that "she must have glanced through" the Offering Memorandum and could only recall seeing the map contained therein. *See* Deposition of Selin Cebeci–Gulcelik ("Cebeci–Gulcelik Dep."), Ex. B to the Colon Decl., at 90–91.

### 2. The Road Show

On February 23, 1998, before plaintiffs made the decision to purchase the NSM Notes, three NatWest representatives, a McDonald employee, and the Chief Executive Officer of NSM met with Mayer and

Cebeci–Gulcelik to pitch the investment. At this presentation, Mayer and Cebeci–Gulcelik were presented with written materials about the NSM project, including a bound set of approximately fifty slides. *See* Declaration of Jack N. Mayer ("Mayer Decl.") ¶ 2 & Ex. A. Various topics were discussed at this presentation, including:

> A discussion of the fact that it was a high quality place; discussion that it was proven technology, discussion that this was the SDI technology plus certain improvements; discussion of offtake agreements; discussion of the operation of the port; discussion of the availability and pricing of scrap; discussion of the location of the plant; ... discussion of this management team that was coming in; ... Some discussion in general of mini-mills.

Mayer Dep. at 63. Specifically, Mayer was told that the technology to be used at the mill was proven SDI technology and that SDI would be a managing owner. *See id.* at 64, 77–78. Mayer was also assured that the off-take agreements were in place and that there was a "plentiful supply of scrap near the facility at attractive pricing." *Id.* at 67.

In deciding to purchase the NSM Notes, Mayer "directly relied on the information contained in [the] slides and presented to [him] orally at the road show." Mayer Decl. ¶ 2. This is consistent with Mayer's deposition testimony where he stated that the "presentation was very impressive." Mayer Dep. at 112. In particular, Mayer stated that

> based on the presentation that we had heard, based on what was said about the technology, based on the whole presentation, we were kind of prepared to give this the benefit of the doubt ...
>
> \*   \*   \*   \*   \*   \*
>
> We had heard a presentation. The presentation was very impressive. It

seemed as though they had tried to cover all the risk bases and that was critical and it was a very important part of the presentation.

*Id.* at 114, 118. And while Mayer admitted that he did not conduct an independent analysis of NSM, he stated that he relied mostly upon the road show presentation as well as his discussions with Cebeci–Gulcelik. *See id.* at 120.

## II. DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law[,]' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Colum-*

*bia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505). However, the non-moving party may not "rest upon ... mere allegations or denials." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999), *cert. denied,* 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000); *see also Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted).

### B. Reliance as an Element

■ To win a federal securities claim under section 10(b) and Rule 10b–5, a plaintiff must show that the defendant knowingly made a misrepresentation of material fact or failed to disclose a material fact, that plaintiff relied on the misrepresentation or omission, and that plaintiff suffered a loss as a result. *See AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 208 (2d Cir.2000). The reliance element does not require complex legal analysis and may be satisfied simply by plaintiff's testimony. *See, e.g., McMahan & Co. v. Wherehouse Entm't, Inc.,* 859 F.Supp. 743, 753–54 (S.D.N.Y.1994) (denying summary judgment where plaintiffs explained under oath that they relied on misrepresentations in purchasing debentures), *rev'd on other grounds,* 65 F.3d 1044 (2d Cir.1995). Similarly, to recover for common law fraud in New York, a plaintiff must demonstrate a misrepresentation of material fact made with knowledge of falsity, justifiable reliance on such misrepresentation, and damages. *See Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370 (1996).

■ There are a number of reasons why plaintiffs cannot possibly prove that they relied on the alleged misrepresentations contained in the Offering Memorandum. First, despite Mayer's declaration that he "read, and relied on, parts of one of the offering memoranda," Mayer Decl. at ¶ 2, the evidence shows that he did not read the entire Offering Memorandum. If he had, he would have read the substantial "Risk Factors" section as well as the earlier disclaimers. There is no need to decide, however, whether the disclaimers contained in the Offering Memorandum are sufficient to preclude reliance on representations in that document. Here, Gabriel Capital admitted that it was provided with the final Offering Memorandum after it decided to purchase the NSM Notes. Consequently, it could not have relied on the Offering Memorandum in making this investment decision.[4] As plaintiffs' Second Amended Complaint only refers to false and misleading statements made in the Offering Memorandum, and not to statements made in the Preliminary Offering Memorandum, *see e.g.,* SAC ¶¶ 25a, 27b, c, d & e, 29a, 31a, 33a & b, 34b, there could be no reliance on the Offering Memorandum as a matter of law. Belated reliance cannot support a federal securities claim or a claim under New York common law. Accordingly, any claims regarding misrepresentations made in the Offering Memorandum are dismissed.

■ The situation is quite different with respect to the alleged misrepresentations

---

**4.** This point was conceded by plaintiff's counsel, Thomas B. Hatch, during a telephone conference held on September 28, 2001.

made during the road show, both orally and in the slides. There is substantial evidence that Mayer, if not Cebeci–Gulcelik, placed a great deal of confidence in what was presented at the road show. In fact, Mayer expressly stated that he relied on the oral information presented at the road show as well as the information contained in the slides. This in itself is sufficient to raise a material issue of fact regarding plaintiffs' reliance.

Defendants claim that plaintiffs' failure to read the Offering Memorandum "defeats any claim that they were mislead by alleged misstatements made at promotional 'road shows.'" Reply Memorandum in Further Support of the NatWest Defendants' Motion for Summary Judgment at 4. This argument, however, was raised previously and decided in the context of defendants' first motion to dismiss, albeit in slightly different form. In *Gabriel I*, NatWest and McDonald argued

> that any prior [road show] representations were contradicted by the Offering Memorandum, making reliance on those representations unreasonable.... Although NatWest and McDonald do identify several contradictions between earlier representations and the Offering Memorandum, their list is by no means exhaustive. Plaintiffs have identified a number of allegedly false representations in the slides that are not contradicted by the Offering Memorandum.... *The representations made at*

> *the road show and in the slides contained no disclaimer analogous to the ones in the Offering Memorandum. As a result, plaintiff[s] could justifiably rely on those representations.*

94 F.Supp.2d at 507–08 (emphasis added). *Gabriel I* held that contradictions and disclaimers in the Offering Memorandum could not defeat reliance on the road show representations *as a matter of law*. It stands to reason, similarly, that a failure to read the Offering Memorandum cannot defeat plaintiffs' claim of reliance on road show misrepresentations or omissions *as a matter of law*. However, a jury may conclude that the timely receipt of the Offering Memorandum defeats plaintiffs' claim of reliance on material presented at the road show. Therefore, all of plaintiffs' claims regarding misrepresentations made at the road show must be decided at trial.[5] As limited by this Opinion, the trial shall proceed as scheduled.

SO ORDERED.

---

**5.** Plaintiffs also state that "the record shows several material omissions." Memorandum in Opposition to the NatWest Defendants' Motion for Summary Judgment at 18. *See, e.g.,* purported omissions regarding the quality of steel produced and the availability of working capital. The citations supporting these omissions refer to various expert reports rather than the Second Amended Complaint. *See* Expert Report of Ralph O. Hellmold, Chairman, The Private Investment Banking Co., Ex. A to the Declaration of Randall Tietjen, plaintiffs' attorney, ("Teitjen Decl."), at 19–23; Expert Report of Arthur H. Cobb, Cobb & Associates, Ltd., Ex. C of Teitjen Decl., at 9–10. But these expert reports state that these omissions are from the Offering Memorandum, not the road show. Plaintiffs may therefore conform the pleadings to the proof by filing a Third Amended Complaint identifying the pertinent omissions and when they were allegedly omitted within 10 days of the date of this Order.